# FALL RIVER DYEING & FINISHING CORP. *v.*
# NATIONAL LABOR RELATIONS BOARD

No. 85–1208.    Argued March 2, 1987—Decided June 1, 1987

28

BLACKMUN, J., delivered the opinion of the Court, in which BRENNAN, MARSHALL, STEVENS, and SCALIA, JJ., joined, and in Parts I and III of which WHITE, J., joined. POWELL, J., filed a dissenting opinion, in which REHNQUIST, C. J., and O'CONNOR, J., joined, *post,* p. 54.

*Ira Drogin* argued the cause and filed briefs for petitioner.
*Deputy Solicitor General Cohen* argued the cause for respondent. With him on the brief were *Solicitor General Fried, Christopher J. Wright, Norton J. Come, Linda Sher,* and *Robert C. Bell, Jr.**

JUSTICE BLACKMUN delivered the opinion of the Court.†

In this case we are confronted with the issue whether the National Labor Relations Board's decision is consistent with *NLRB* v. *Burns International Security Services, Inc.,* 406 U. S. 272 (1972). In *Burns,* this Court ruled that the new employer, succeeding to the business of another, had an obligation to bargain with the union representing the predecessor's employees. *Id.,* at 278–279. We first must decide whether *Burns* is limited to a situation where the union only recently was certified before the transition in employers, or whether that decision also applies where the union is entitled to a presumption of majority support. Our inquiry then pro-

---

*Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States by *Peter G. Nash* and *Stephen A. Bokat;* and for the Legal Foundation of America by *Jean Fleming Powers* and *David Crump.*

*Marsha S. Berzon, D. Bruce Shine,* and *Laurence Gold* filed a brief for the American Federation of Labor and Congress of Industrial Organizations et al. as *amici curiae* urging affirmance.

†JUSTICE WHITE joins only Parts I and III of this opinion.

ceeds to three questions that concern rules the Labor Board has developed in the successorship context. First, we must determine whether there is substantial record evidence to support the Board's conclusion that petitioner was a "successor" to Sterlingwale Corp., its business predecessor. Second, we must decide whether the Board's "substantial and representative complement" rule, designed to identify the date when a successor's obligation to bargain with the predecessor's employees' union arises, is consistent with *Burns*, is reasonable, and was applied properly in this case. Finally, we must examine the Board's "continuing demand" principle to the effect that, if a union has presented to a successor a premature demand for bargaining, this demand continues in effect until the successor acquires the "substantial and representative complement" of employees that triggers its obligation to bargain.

## I

For over 30 years before 1982, Sterlingwale operated a textile dyeing and finishing plant in Fall River, Mass. Its business consisted basically of two types of dyeing, called, respectively, "converting" and "commission." Under the converting process, which in 1981 accounted for 60% to 70% of its business, see App. 149, Sterlingwale bought unfinished fabrics for its own account, dyed and finished them, and then sold them to apparel manufacturers. *Id.*, at 123. In commission dyeing, which accounted for the remainder of its business, Sterlingwale dyed and finished fabrics owned by customers according to their specifications. *Id.*, at 124. The financing and marketing aspects of converting and commission dyeing are different. Converting requires capital to purchase fabrics and a sales force to promote the finished products. *Id.*, at 123. The production process, however, is the same for both converting and commission dyeing. *Id.*, at 98.

In the late 1970's the textile-dyeing business, including Sterlingwale's, began to suffer from adverse economic condi-

tions and foreign competition. After 1979, business at Sterlingwale took a serious turn for the worse because of the loss of its export market, *id.*, at 127–128, and the company reduced the number of its employees, *id.*, at 192–195. Finally, in February 1982, Sterlingwale laid off all its production employees, primarily because it no longer had the capital to continue the converting business. *Id.*, at 77–78, 104, 130–132. It retained a skeleton crew of workers and supervisors to ship out the goods remaining on order and to maintain the corporation's building and machinery. *Id.*, at 147–148. In the months following the layoff, Leonard Ansin, Sterlingwale's president, liquidated the inventory of the corporation and, at the same time, looked for a business partner with whom he could "resurrect the business." *Id.*, at 114–115, 146–147. Ansin felt that he owed it to the community and to the employees to keep Sterlingwale in operation. *Id.*, at 103–104.

For almost as long as Sterlingwale had been in existence, its production and maintenance employees had been represented by the United Textile Workers of America, AFL–CIO, Local 292 (Union). *Id.*, at 60–61. The most recent collective-bargaining agreement before Sterlingwale's demise had been negotiated in 1978 and was due to expire in 1981. By an agreement dated October 1980, however, in response to the financial difficulties suffered by Sterlingwale, the Union agreed to amend the 1978 agreement to extend its expiration date by one year, until April 1, 1982, without any wage increase and with an agreement to improve labor productivity. *Id.*, at 353–355. In the months following the final February 1982 layoff, the Union met with company officials over problems involving this job action, and, in particular, Sterlingwale's failure to pay premiums on group-health insurance. *Id.*, at 66–67, 86, 131. In addition, during meetings with Ansin, Union officials told him of their concern with Sterlingwale's future and their interest in helping to keep the

company operating or in meeting with prospective buyers. *Id.*, at 67–68, 86, 146–147.

In late summer 1982, however, Sterlingwale finally went out of business. It made an assignment for the benefit of its creditors, *id.*, at 115, 147, primarily Ansin's mother, who was an officer of the corporation and holder of a first mortgage on most of Sterlingwale's real property, *id.*, at 113, and the Massachusetts Capital Resource Corporation (MCRC), which held a security interest on Sterlingwale's machinery and equipment, *id.*, at 113–114. Ansin also hired a professional liquidator to dispose of the company's remaining assets, mostly its inventory, at auction. *Id.*, at 115.

During this same period, a former Sterlingwale employee and officer, Herbert Chace, and Arthur Friedman, president of one of Sterlingwale's major customers, Marcamy Sales Corporation (Marcamy), formed petitioner Fall River Dyeing & Finishing Corp. Chace, who had resigned from Sterlingwale in February 1982, had worked there for 27 years, had been vice president in charge of sales at the time of his departure, and had participated in collective bargaining with the Union during his tenure at Sterlingwale. *Id.*, at 189, 232. Chace and Friedman formed petitioner with the intention of engaging strictly in the commission-dyeing business and of taking advantage of the availability of Sterlingwale's assets and work force. *Id.*, at 203–204, 223–224. Accordingly, Friedman had Marcamy acquire from MCRC and Ansin's mother Sterlingwale's plant, real property, and equipment, *id.*, at 238–272, and convey them to petitioner, *id.*, at 278–289.[1] Petitioner also obtained some of Sterlingwale's remaining inventory at the liquidator's auction. *Id.*, at 200–202, 290–293. Chace became petitioner's vice president in charge of operations and Friedman became its president. *Id.*, at 190, 232.

In September 1982, petitioner began operating out of Sterlingwale's former facilities and began hiring employees.

---

[1] Petitioner did not acquire one of the three buildings formerly used by Sterlingwale, App. 200–201, and closed one that it did acquire, *id.*, at 195.

*Id.*, at 206–207. It advertised for workers and supervisors in a local newspaper, *id.*, at 197–198, and Chace personally got in touch with several prospective supervisors, *id.*, at 197. Petitioner hired 12 supervisors, of whom 8 had been supervisors with Sterlingwale and 3 had been production employees there. *Id.*, at 196, 220–222. In its hiring decisions for production employees, petitioner took into consideration recommendations from these supervisors and a prospective employee's former employment with Sterlingwale. *Id.*, at 223–224. Petitioner's initial hiring goal was to attain one full shift of workers, which meant from 55 to 60 employees. *Id.*, at 208. Petitioner planned to "see how business would be" after this initial goal had been met and, if business permitted, to expand to two shifts. *Ibid.* The employees who were hired first spent approximately four to six weeks in start-up operations and an additional month in experimental production. *Id.*, at 156–157, 207, 226–227.

By letter dated October 19, 1982, the Union requested petitioner to recognize it as the bargaining agent for petitioner's employees and to begin collective bargaining. *Id.*, at 360. Petitioner refused the request, stating that, in its view, the request had "no legal basis." *Id.*, at 362. At that time, 18 of petitioner's 21 employees were former employees of Sterlingwale. See 272 N. L. R. B. 839, 840 (1984). By November of that year, petitioner had employees in a complete range of jobs, had its production process in operation, and was handling customer orders, App. 225–226; by mid-January 1983, it had attained its initial goal of one shift of workers, *id.*, at 225, 227. Of the 55 workers in this initial shift, a number that represented over half the workers petitioner would eventually hire, 36 were former Sterlingwale employees. Tr. of Oral Arg. 28. Petitioner continued to expand its work force, and by mid-April 1983, it had reached two full shifts. For the first time, ex-Sterlingwale employees were in the minority but just barely so (52 or 53 out of 107 employees). App. 294–302; Tr. of Oral Arg. 28.

Although petitioner engaged exclusively in commission dyeing, the employees experienced the same conditions they had when they were working for Sterlingwale. The production process was unchanged and the employees worked on the same machines, in the same building, with the same job classifications, under virtually the same supervisors. App. 152–156, 205–206. Over half the volume of petitioner's business came from former Sterlingwale customers, and, in particular, Marcamy. *Id.*, at 314–316.

On November 1, 1982, the Union filed an unfair labor practice charge with the Board, alleging that in its refusal to bargain petitioner had violated §§ 8(a)(1) and (5) of the National Labor Relations Act (NLRA), 49 Stat. 452, as amended, 29 U. S. C. §§ 158(a)(1) and (5).[2] After a hearing, the Administrative Law Judge (ALJ) decided that, on the facts of the case, petitioner was a successor to Sterlingwale. 272 N. L. R. B., at 840. He observed that petitioner therefore would have an obligation to bargain with the Union if the majority of petitioner's employees were former employees of Sterlingwale. He noted that the proper date for making this determination was not mid-April, when petitioner first had two shifts working, but mid-January, when petitioner had attained a "representative complement" of employees. *Ibid.* The ALJ acknowledged that a demand for bargaining from the Union was necessary to trigger petitioner's obligation to bargain, but noted that the Union's demand of October 1982, although premature, was "of a continuing nature." *Ibid.*

---

[2] These read in pertinent part:

"§ 158. Unfair labor practices

"(a) Unfair labor practices by employer

"It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . . . .

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

Thus, in the view of the ALJ, petitioner's duty to bargain arose in mid-January because former Sterlingwale employees then were in the majority and because the Union's October demand was still in effect. Petitioner thus committed an unfair labor practice in refusing to bargain. In a brief decision and order, the Board, with one member dissenting, affirmed this decision. *Id.*, at 839.[3]

The Court of Appeals for the First Circuit, also by a divided vote, enforced the order. 775 F. 2d 425 (1985). The court first found, *id.*, at 428–430, that the Board's determination that petitioner was Sterlingwale's successor was consistent with *Burns* and was "supported by substantial evidence in the record." 775 F. 2d, at 430. The court observed: "The differences between [petitioner's] business and Sterlingwale's are not sufficiently significant to require a finding that the continuity of the enterprise, viewed from the employees' standpoint, was broken." *Ibid.* The court then noted that the Board's longstanding "substantial and representative complement" standard, *id.*, at 431, which the ALJ applied in this case, is an attempt to establish a method for determining when a successor has to bargain with the predecessor's union in a situation where, at the moment of the transition between the old and new enterprises, it is not clear when the new employer will reach a "full complement of employees." *Id.*, at 430–431. According to the court, the Board's determination that petitioner had "employed a substantial and representative complement of its workforce in mid-January" was reasonable. *Id.*, at 431. Finally, the court found that the Board's rule treating a premature union demand for bargaining as a continuing demand also was reasonable and "practical" and entitled to deference. *Id.*, at 432–433.[4]

---

[3] In the view of the dissenting member, the Union's complaint should have been dismissed because the Union failed to renew its bargaining request after petitioner properly denied it. 272 N. L. R. B. 839 (1984).

[4] The dissenting judge argued that the Board's "substantial and representative complement" rule was contrary to this Court's decision in *NLRB*

Because of the importance of the successorship issue in labor law, and because of our interest in the rules developed by the Board for successorship cases, we granted certiorari. 476 U. S. 1139 (1986).

## II

Fifteen years ago in *NLRB* v. *Burns International Security Services, Inc.*, 406 U. S. 272 (1972), this Court first dealt with the issue of a successor employer's obligation to bargain with a union that had represented the employees of its predecessor. In *Burns*, about four months before the employer transition, the security-guard employees of Wackenhut Corp. had chosen a particular union as their bargaining representative and that union had negotiated a collective-bargaining agreement with Wackenhut. Wackenhut, however, lost its service contract on certain airport property to Burns. Burns proceeded to hire 27 of the Wackenhut guards for its 42-guard operation at the airport. Burns told its guards that, as a condition of their employment, they must join the union with which Burns already had collective-bargaining agreements at other locations. When the union that had represented the Wackenhut employees brought unfair labor practice charges against Burns, this Court agreed with the Board's determination that Burns had an obligation to bargain with this union. We observed:

> "In an election held but a few months before, the union had been designated bargaining agent for the employees in the unit and a majority of these employees had been hired by Burns for work in the identical unit. It is undisputed that Burns knew all the relevant facts in this regard and was aware of the certification and of the

v. *Burns International Security Services, Inc.*, 406 U. S. 272 (1972), that petitioner was not a successor of Sterlingwale, and that, in light of the premature bargaining demand of the Union, which petitioner properly rejected, petitioner had a "good faith doubt" about the Union's majority status that relieved it of any obligation to bargain. 775 F. 2d, at 434–441.

existence of a collective-bargaining contract. In these circumstances, it was not unreasonable for the Board to conclude that the union certified to represent all employees in the unit still represented a majority of the employees and that Burns could not reasonably have entertained a good-faith doubt about that fact. Burns' obligation to bargain with the union over terms and conditions of employment stemmed from its hiring of Wackenhut's employees and from the recent election and Board certification." *Id.*, at 278–279.

Although our reasoning in *Burns* was tied to the facts presented there, see *id.*, at 274, we suggested that our analysis would be equally applicable even if a union with which a successor had to bargain had not been certified just before the transition in employers. We cited with approval, *id.*, at 279 and 281, Board and Court of Appeals decisions where it "ha[d] been consistently held that a mere change of employers or of ownership in the employing industry is not such an 'unusual circumstance' as to affect the force of the Board's certification within the normal operative period if a majority of employees after the change of ownership or management were employed by the preceding employer." *Id.*, at 279. Several of these cases involved successorship situations where the union in question had not been certified only a short time before the transition date. See, *e. g.*, *NLRB* v. *Auto Ventshade, Inc.*, 276 F. 2d 303, 305 (CA5 1960); *Tom-A-Hawk Transit, Inc.* v. *NLRB*, 419 F. 2d 1025, 1026 (CA7 1969).

Moreover, in defining "the force of the Board's certification within the normal operative period," 406 U. S., at 279, we referred in *Burns* to two presumptions regarding a union's majority status following certification. See *id.*, at 279, n. 3. First, after a union has been certified by the Board as a bargaining-unit representative, it usually is entitled to a conclusive presumption of majority status for one year following the certification. See *ibid.*, citing *Brooks* v. *NLRB*,

348 U. S. 96, 98–99 (1954); see also 29 U. S. C. § 159(c)(3) ("No election shall be directed in any bargaining unit or any subdivision within which in the preceding twelve-month period, a valid election shall have been held"). Second, after this period, the union is entitled to a rebuttable presumption of majority support. 406 U. S., at 279, n. 3, citing *Celanese Corp. of America*, 95 N. L. R. B. 664, 672 (1951).

These presumptions are based not so much on an absolute certainty that the union's majority status will not erode following certification, as on a particular policy decision. The overriding policy of the NLRA is "industrial peace." *Brooks* v. *NLRB*, 348 U. S., at 103. The presumptions of majority support further this policy by "promot[ing] stability in collective-bargaining relationships, without impairing the free choice of employees." *Terrell Machine Co.*, 173 N. L. R. B. 1480 (1969), enf'd, 427 F. 2d 1088 (CA4), cert. denied, 398 U. S. 929 (1970). In essence, they enable a union to concentrate on obtaining and fairly administering a collective-bargaining agreement without worrying that, unless it produces immediate results, it will lose majority support and will be decertified. See *Brooks* v. *NLRB*, 348 U. S., at 100. The presumptions also remove any temptation on the part of the employer to avoid good-faith bargaining in the hope that, by delaying, it will undermine the union's support among the employees. See *ibid.;* see also R. Gorman, Labor Law 53 (1976).[5] The upshot of the presumptions is to permit unions

---

[5] Because the Chamber of Commerce as *amicus curiae* overlooks or ignores our acceptance of the presumptions in *Burns* as well as their significance, it can contend that *Burns* "turned on the particular circumstances in that case—the recent union election and certification which arguably provided a factual basis for presuming that a majority of Burns' employees wanted to be represented by the union," Brief for Chamber of Commerce of United States as *Amicus Curiae* 17, and that *Burns* requires "that there must be some rational factual basis for presumptions of majority union support among a successor's workforce." *Id.*, at 18–19. This misunderstanding of the nature of the presumptions leads to the Chamber's proposal that, in a situation where the successor employer arrives at a "full complement"

to develop stable bargaining relationships with employers, which will enable the unions to pursue the goals of their members, and this pursuit, in turn, will further industrial peace.

The rationale behind the presumptions is particularly pertinent in the successorship situation and so it is understandable that the Court in *Burns* referred to them. During a transition between employers, a union is in a peculiarly vulnerable position. It has no formal and established bargaining relationship with the new employer, is uncertain about the new employer's plans, and cannot be sure if or when the new employer must bargain with it. While being concerned with the future of its members with the new employer, the union also must protect whatever rights still exist for its members under the collective-bargaining agreement with the predecessor employer.[6] Accordingly, during this unsettling transition period, the union needs the presumptions of majority status to which it is entitled to safeguard its members' rights and to develop a relationship with the successor.

The position of the employees also supports the application of the presumptions in the successorship situation. If the employees find themselves in a new enterprise that substantially resembles the old, but without their chosen bargaining representative, they may well feel that their choice of a union

of employees only gradually, the union should be forced to petition for a Board election to establish again its majority support. *Id.*, at 26. Acceptance of the Chamber's views, which essentially advocate a rejection of the presumptions as they are presently understood, logically would require such an election whenever *any* doubts existed about a union's majority status, regardless of whether the employer remained the same.

[6] The difficulty a union faces during an employer-transition period is graphically exhibited by the facts of this case. The Union was confronted with the layoff. App. 64. Although officials at Sterlingwale were willing to meet with it, the Union unsuccessfully attempted to have Sterlingwale honor its commitments under the collective-bargaining agreement, particularly those dealing with health benefits. *Id.*, at 78–86. Moreover, despite the Union's desire to participate in the transition between employers, it was left entirely in the dark about petitioner's acquisition. *Id.*, at 68–69.

is subject to the vagaries of an enterprise's transformation. This feeling is not conducive to industrial peace. In addition, after being hired by a new company following a layoff from the old, employees initially will be concerned primarily with maintaining their new jobs. In fact, they might be inclined to shun support for their former union, especially if they believe that such support will jeopardize their jobs with the successor or if they are inclined to blame the union for their layoff and problems associated with it.[7] Without the presumptions of majority support and with the wide variety of corporate transformations possible, an employer could use a successor enterprise as a way of getting rid of a labor contract and of exploiting the employees' hesitant attitude towards the union to eliminate its continuing presence.

In addition to recognizing the traditional presumptions of union majority status, however, the Court in *Burns* was careful to safeguard "'the rightful prerogative of owners independently to rearrange their businesses.'" *Golden State Bottling Co.* v. *NLRB*, 414 U. S. 168, 182 (1973), quoting *John Wiley & Sons, Inc.* v. *Livingston*, 376 U. S. 543, 549 (1964). We observed in *Burns* that, although the successor has an obligation to bargain with the union, it "is ordinarily free to set initial terms on which it will hire the employees of a predecessor," 406 U. S., at 294, and it is not bound by the substantive provisions of the predecessor's collective-bargaining agreement. *Id.*, at 284. We further explained that the successor is under no obligation to hire the employees of its predecessor, subject, of course, to the restriction that it not discriminate against union employees in its hiring. *Id.*, at 280, and n. 5; see also *Howard Johnson Co.* v. *Hotel Employees*, 417 U. S. 249, 262, and n. 8 (1974). Thus, to

---

[7] In fact, it appears that the dissatisfaction with the Union felt by some former Sterlingwale employees who were hired by petitioner was due to the Union's inability to obtain benefits, such as payment for health insurance, severance pay, and vacation pay, from the failing Sterlingwale. App. 168, 174, 179–180. See also n. 18, *infra*.

a substantial extent the applicability of *Burns* rests in the hands of the successor. If the new employer makes a conscious decision to maintain generally the same business and to hire a majority of its employees from the predecessor, then the bargaining obligation of §8(a)(5) is activated. This makes sense when one considers that the employer *intends* to take advantage of the trained work force of its predecessor.[8]

Accordingly, in *Burns* we acknowledged the interest of the successor in its freedom to structure its business and the interest of the employees in continued representation by the union. We now hold that a successor's obligation to bargain is not limited to a situation where the union in question has been recently certified. Where, as here, the union has a rebuttable presumption of majority status, this status continues despite the change in employers. And the new employer has an obligation to bargain with that union so long as the new employer is in fact a successor of the old employer and the majority of its employees were employed by its predecessor.[9]

---

[8] If, during negotiations, a successor questions a union's continuing majority status, the successor "may lawfully withdraw from negotiation at any time following recognition if it can show that the union had in fact lost its majority status at the time of the refusal to bargain or that the refusal to bargain was grounded on a good-faith doubt based on objective factors that the union continued to command majority support." *Harley-Davidson Transp. Co.*, 273 N. L. R. B. 1531 (1985). The ALJ made no express finding on the issue of petitioner's good-faith doubt. Moreover, an employer, unsure of a union's continued majority support, may petition the Board for another election. See *NLRB* v. *Financial Institution Employees*, 475 U. S. 192, 198 (1986); *Brooks* v. *NLRB*, 348 U. S. 96, 101 (1954). Petitioner did not request an election.

[9] Last Term, we struck down a recently adopted Board rule requiring that nonunion employees must be permitted to vote in a certified union's decision to affiliate with another union. Under that rule, if the union did not permit such voting, the Board would not amend the union's certification or compel the employer to bargain with the reorganized union. See *NLRB* v. *Financial Institution Employees*, 475 U. S., at 201. This rule was in direct conflict with a previous Board position whereby the affiliation

## III

We turn now to the three rules, as well as to their application to the facts of this case, that the Board has adopted for the successorship situation. The Board, of course, is given considerable authority to interpret the provisions of the NLRA. See *NLRB* v. *Financial Institution Employees*, 475 U. S. 192, 202 (1986). If the Board adopts a rule that is rational and consistent with the Act, see *ibid.*, then the rule is entitled to deference from the courts. Moreover, if the Board's application of such a rational rule is supported by substantial evidence on the record, courts should enforce the Board's order. See *Beth Israel Hospital* v. *NLRB*, 437 U. S. 483, 501 (1978); *Universal Camera Corp.* v. *NLRB*, 340 U. S. 474, 488 (1951). These principles also guide our review of the Board's action in a successorship case. See, *e. g.*, *Golden State Bottling Co.* v. *NLRB*, 414 U. S., at 181.

---

was permitted so long as the *members* of the union voted for it and there was substantial continuity between the new and the old unions. *Id.*, at 199–200. In rejecting the new rule, we observed that "'[t]he industrial stability sought by the Act would unnecessarily be disrupted if every union organizational adjustment were to result in displacement of the employer-bargaining representative relationship.'" *Id.*, at 202–203, quoting *Canton Sign Co.*, 174 N. L. R. B. 906, 909 (1969), enf. denied on other grounds, 457 F. 2d 832 (CA6 1972). We observed: "In many cases, a majority of employees will continue to support the union despite any changes precipitated by affiliation." 475 U. S., at 203. In our view,

"[t]he Act assumes that stable bargaining relationships are best maintained by allowing an affiliated union to continue representing a bargaining unit unless the Board finds that the affiliation raises a question of representation. The Board's rule contravenes this assumption, since an employer may invoke a perceived procedural defect to cease bargaining even though the union succeeds the organization the employees chose, the employees have made no effort to decertify the union, and the employer presents no evidence to challenge the union's majority status." *Id.*, at 209.

As explained earlier, this concern about stable bargaining relations and the presumption of a union's majority status are equally applicable in the instant case.

## A

In *Burns* we approved the approach taken by the Board and accepted by courts with respect to determining whether a new company was indeed the successor to the old. 406 U. S., at 280–281, and n. 4. This approach, which is primarily factual in nature and is based upon the totality of the circumstances of a given situation, requires that the Board focus on whether the new company has "acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations." *Golden State Bottling Co.* v. *NLRB*, 414 U. S., at 184. Hence, the focus is on whether there is "substantial continuity" between the enterprises. Under this approach, the Board examines a number of factors: whether the business of both employers is essentially the same; whether the employees of the new company are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products, and basically has the same body of customers. See *Burns*, 406 U. S., at 280, n. 4; *Aircraft Magnesium, Division of Grico Corp.*, 265 N. L. R. B. 1344, 1345 (1982), enf'd, 730 F. 2d 767 (CA9 1984); *Premium Foods, Inc.*, 260 N. L. R. B. 708, 714 (1982), enf'd, 709 F. 2d 623 (CA9 1983).

In conducting the analysis, the Board keeps in mind the question whether "those employees who have been retained will understandably view their job situations as essentially unaltered." See *Golden State Bottling Co.*, 414 U. S., at 184; *NLRB* v. *Jeffries Lithograph Co.*, 752 F. 2d 459, 464 (CA9 1985). This emphasis on the employees' perspective furthers the Act's policy of industrial peace. If the employees find themselves in essentially the same jobs after the employer transition and if their legitimate expectations in continued representation by their union are thwarted, their

dissatisfaction may lead to labor unrest. See *Golden State Bottling Co.*, 414 U. S., at 184.

Although petitioner does not challenge the Board's "substantial continuity" approach, it does contest the application of the rule to the facts of this case. Essentially for the reasons given by the Court of Appeals, 775 F. 2d, at 430, however, we find that the Board's determination that there was "substantial continuity" between Sterlingwale and petitioner and that petitioner was Sterlingwale's successor is supported by substantial evidence in the record. Petitioner acquired most of Sterlingwale's real property, its machinery and equipment, and much of its inventory and materials.[10] It introduced no new product line. Of particular significance is the fact that, from the perspective of the employees, their jobs did not change. Although petitioner abandoned converting dyeing in exclusive favor of commission dyeing, this change did not alter the essential nature of the employees' jobs, because both types of dyeing involved the same production process. The job classifications of petitioner were the same as those of Sterlingwale; petitioner's employees worked on the same machines under the direction of supervisors most of whom were former supervisors of Sterlingwale. The record, in fact, is clear that petitioner acquired Sterlingwale's assets with the express purpose of taking advantage of its predecessor's work force.

---

[10] Petitioner makes much of the fact that it purchased the assets of Sterlingwale on the "open market." Brief for Petitioner 17. Petitioner, however, overlooks the fact that it was formed with the express purpose of acquiring Sterlingwale's assets, a purpose it accomplished by having its parent company acquire some of Sterlingwale's major assets and then transferring them to petitioner. So long as there are other indicia of "substantial continuity," the way in which a successor obtains the predecessor's assets is generally not determinative of the "substantial continuity" question. See *Howard Johnson Co.* v. *Hotel Employees*, 417 U. S. 249, 257 (1974); *Golden State Bottling Co.* v. *NLRB*, 414 U. S. 168, 182, n. 5 (1973); see also R. Gorman, Labor Law 122 (1976).

We do not find determinative of the successorship question the fact that there was a 7-month hiatus between Sterlingwale's demise and petitioner's start-up. Petitioner argues that this hiatus, coupled with the fact that its employees were hired through newspaper advertisements—not through Sterlingwale employment records, which were not transferred to it—resolves in its favor the "substantial continuity" question. See Brief for Petitioner 16–17, 20–22; see also 775 F. 2d, at 439 (dissenting opinion). Yet such a hiatus is only one factor in the "substantial continuity" calculus and thus is relevant only when there are other indicia of discontinuity. See *NLRB* v. *Band-Age, Inc.*, 534 F. 2d, 1, 5 (CA1), cert. denied, 429 U. S. 921 (1976). Conversely, if other factors indicate a continuity between the enterprises, and the hiatus is a normal start-up period, the "totality of the circumstances" will suggest that these circumstances present a successorship situation. See *NLRB* v. *Daneker Clock Co.*, 516 F. 2d 315, 316 (CA4 1975); *C. G. Conn, Ltd.*, 197 N. L. R. B. 442, 446–447 (1972), enf'd, 474 F. 2d 1344 (CA5 1973).

For the reasons given above, this is a case where the other factors suggest "substantial continuity" between the companies despite the 7-month hiatus. Here, moreover, the extent of the hiatus between the demise of Sterlingwale and the start-up of petitioner is somewhat less than certain. After the February layoff, Sterlingwale retained a skeleton crew of supervisors and employees that continued to ship goods to customers and to maintain the plant. In addition, until the assignment for the benefit of the creditors late in the summer, Ansin was seeking to resurrect the business or to find a buyer for Sterlingwale. The Union was aware of these efforts. Viewed from the employees' perspective, therefore, the hiatus may have been much less than seven months. Although petitioner hired the employees through advertisements, it often relied on recommendations from supervisors, themselves formerly employed by Sterlingwale, and intended

the advertisements to reach the former Sterlingwale work force.[11]

Accordingly, we hold that, under settled law, petitioner was a successor to Sterlingwale. We thus must consider if and when petitioner's duty to bargain arose.

## B

In *Burns*, the Court determined that the successor had an obligation to bargain with the union because a majority of its employees had been employed by Wackenhut. 406 U. S., at 278–279. The "triggering" fact for the bargaining obligation was this composition of the successor's work force.[12] The

---

[11] Similarly, in light of the general continuity between Sterlingwale and petitioner from the perspective of the employees, we do not find determinative the differences between the two enterprises cited by petitioner. Petitioner's change in marketing and sales, Brief for Petitioner 20, appears to have had no effect on the employer-employee relationship. That petitioner did not assume Sterlingwale's liabilities or trade name, *id.*, at 16, also is not sufficient to outweigh the other factors. See *NLRB* v. *Band-Age, Inc.*, 534 F. 2d 1, 5 (CA1), cert. denied, 429 U. S. 921 (1976); *Zim's Foodliner, Inc.* v. *NLRB*, 495 F. 2d 1131, 1133–1134 (CA7), cert. denied, 419 U. S. 838 (1974). Moreover, the mere reduction in petitioner's size, in comparison to that of Sterlingwale, see Brief for Petitioner 17–18, does not change the nature of the company so as to defeat the employees' expectations in continued representation by their Union. See *NLRB* v. *Middleboro Fire Apparatus, Inc.*, 590 F. 2d 4, 8 (CA1 1978).

[12] After *Burns*, there was some initial confusion concerning this Court's holding. It was unclear if work force continuity would turn on whether a majority of the successor's employees were those of the predecessor or on whether the successor had hired a majority of the predecessor's employees. Compare 406 U. S., at 281 ("[A] majority of the employees hired by the new employer are represented by a recently certified bargaining agent"), with *id.*, at 278 ("[T]he union had been designated bargaining agent for the employees in the unit and a majority of these employees had been hired by Burns"). See also *Howard Johnson Co.* v. *Hotel Employees*, 417 U. S., at 263 ("[S]uccessor employer hires a majority of the predecessor's employees"); *Golden State Bottling Co.* v. *NLRB*, 414 U. S., at 184, n. 6 (same). The Board, with the approval of the Courts of Appeals, has adopted the former interpretation. See *Spruce Up Corp.*, 209 N. L. R. B. 194, 196 (1974), enf'd, 529 F. 2d 516 (CA4 1975); *United Main-*

Court, however, did not have to consider the question *when* the successor's obligation to bargain arose: Wackenhut's contract expired on June 30 and Burns began its services with a majority of former Wackenhut guards on July 1. See *id.*, at 275. In other situations, as in the present case, there is a start-up period by the new employer while it gradually builds its operations and hires employees. In these situations, the Board, with the approval of the Courts of Appeals, has adopted the "substantial and representative complement" rule for fixing the moment when the determination as to the composition of the successor's work force is to be made.[13] If, at this particular moment, a majority of the successor's employees had been employed by its predecessor, then the successor has an obligation to bargain with the union that represented these employees.[14]

---

*tenance & Mfg. Co.*, 214 N. L. R. B. 529, 532–534 (1974); *Saks & Co.* v. *NLRB*, 634 F. 2d 681, 684–686, and nn. 2 and 3 (CA2 1980) (and cases cited therein); see also Note, Appropriate Standards of Successor Employer Obligations under Wiley, Howard Johnson, and Burns, 25 Wayne L. Rev. 1279, 1299 (1979). This issue is not presented by the instant case.

[13] See, *e. g.*, *Indianapolis Mack Sales & Service, Inc.*, 272 N. L. R. B. 690, 694–696 (1984), enf. denied on other grounds, 802 F. 2d 280 (CA7 1986); *NLRB* v. *Jeffries Lithograph Co.*, 752 F. 2d 459, 467 (CA9 1985); *Aircraft Magnesium, a Division of Grico Corp.*, 265 N. L. R. B. 1344, 1345 (1982), enf'd, 730 F. 2d 767 (CA9 1984); *Hudson River Aggregates, Inc.*, 246 N. L. R. B. 192, 197–198 (1979), enf'd, 639 F. 2d 865, 870 (CA2 1981).

[14] Petitioner argues that *Burns* requires that the majority determination be made only when the successor has attained a "full complement" of employees. Brief for Petitioner 22, 29–31; see also Brief for Chamber of Commerce of United States as *Amicus Curiae* 20–21. Petitioner and the *amicus* particularly rely for this argument on one reference in *Burns* to a "full complement":

"Although a successor employer is ordinarily free to set initial terms on which it will hire the employees of a predecessor, there will be instances in which it is perfectly clear that the new employer plans to retain all of the employees in the unit and in which it will be appropriate to have him initially consult with the employees' bargaining representative before he fixes terms. In other situations, however, it may not be clear until the succes-

This rule represents an effort to balance "'the objective of insuring maximum employee participation in the selection of a bargaining agent against the goal of permitting employees to be represented as quickly as possible.'" 775 F. 2d, at 430–431, quoting *NLRB* v. *Pre-Engineered Building Products, Inc.*, 603 F. 2d 134, 136 (CA10 1979).[15] In deciding

---

sor employer has hired his full complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit as required by § 9(a) of the Act, 29 U. S. C. § 159(a)." 406 U. S., at 294–295.

This remark, however, was made after the Court had resolved the successorship issue and when it was examining whether a successor would have to bargain with the union before setting the initial terms and conditions of employment. In particular, in using the term "full complement," the Court was distinguishing the exceptional situation, alluded to in the prior sentence, in which a successor should consult with the union before setting these terms and conditions, from the standard situation in which a successor could set its own terms free of the union's involvement. The Court was not defining "full complement" with respect to fixing the moment when the successor would have to bargain with the union. *Burns* therefore lends no support to an interpretation of that term to mean that the successor's bargaining obligation arises only when it has hired all the employees it intends to employ.

[15] The "substantial and representative complement" rule originated in the context of the initial representation election when, faced with an expanding or contracting work force, the Board had to determine the appropriate time for an election. See, *e. g., Clement-Blythe Companies*, 182 N. L. R. B. 502 (1970), enf'd, 77 LRRM 2373 (CA4 1971). The rationale for the rule was as follows:

"The Board must often balance what are sometimes conflicting *desiderata*, the insurance of maximum employee participation in the selection of a bargaining agent, and permitting employees who wish to be represented as immediate representation as possible. Thus, it would unduly frustrate existing employees' choice to delay selection of a bargaining representative for months or years until the very last employee is on board. Conversely, it would be pointless to hold an election for very few employees when in a relatively short period the employee complement is expected to multiply many times." 182 N. L. R. B., at 502.

Similar reasoning applies in the successorship context. On the one hand, there is a concern to allow as many employees as possible of the successor

when a "substantial and representative complement" exists in a particular employer transition, the Board examines a number of factors. It studies "whether the job classifications designated for the operation were filled or substantially filled and whether the operation was in normal or substantially normal production." See *Premium Foods, Inc.* v. *NLRB,* 709 F. 2d 623, 628 (CA9 1983). In addition, it takes into consideration "the size of the complement on that date and the time expected to elapse before a substantially larger complement would be at work . . . as well as the relative certainty of the employer's expected expansion." *Ibid.*

Petitioner contends that the Board's "representative complement" rule is unreasonable, given that it injures the representation rights of many of the successor's employees and that it places significant burdens upon the successor, which is unsure whether and when the bargaining obligation will arise. Brief for Petitioner 24–31; see also Brief for Chamber of Commerce of United States as *Amicus Curiae* 21–25. According to petitioner, if majority status is determined at the "full complement" stage, all the employees will have a voice in the selection of their bargaining representative, and this will reveal if the union truly has the support of most of the successor's employees. This approach, however, focuses only on the interest in having a bargaining representative selected by the majority of the employees. It fails to take into account the significant interest of employees in being represented as soon as possible. The latter interest is especially heightened in a situation where many of the successor's employees, who were formerly represented by a union, find themselves after the employer transition in essentially the same enterprise, but without their bargaining representative. Having the new employer refuse to bargain with the chosen representative of these employees "disrupts the employees' morale, deters their organizational activities, and

---

to participate in the selection of the union. On the other hand, the previous choice of a union by those employees of the successor who had worked for the predecessor should not be frustrated.

discourages their membership in unions." *Franks Bros. Co.* v. *NLRB*, 321 U. S. 702, 704 (1944). Accordingly, petitioner's "full complement" proposal must fail.[16]

Nor do we believe that this "substantial and representative complement" rule places an unreasonable burden on the employer. It is true that, if an employer refuses to bargain with the employees once the representative complement has been attained, it risks violating § 8(a)(5). Furthermore, if an employer recognizes the union before this complement has been reached, this recognition could constitute a violation of § 8(a)(2), which makes it an unfair labor practice for an employer to support a labor organization. 29 U. S. C. § 158(a)(2). And, unlike the initial election situation, see n. 15, *supra*, here the employer, not the Board, applies this rule.

We conclude, however, that in this situation the successor is in the best position to follow a rule the criteria of which are straightforward.[17] The employer generally will know with tolerable certainty when all its job classifications have been filled or substantially filled, when it has hired a majority of the employees it intends to hire, and when it has begun normal production. Moreover, the "full complement" standard advocated by petitioner is not *necessarily* easier for a succes-

---

[16] Long ago, in *Brooks* v. *NLRB*, 348 U. S. 96 (1954), this Court observed: "To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to that end [of industrial peace], it is inimical to it." *Id.*, at 103. Moreover, the employees are not powerless to reject a union that they believe no longer commands their support. See *NLRB* v. *Financial Institution Employees*, 475 U. S., at 198.

[17] The distinction between the successorship situation and the initial election context, where the Board itself applies the "substantial and representative complement" rule, lies partly in the fact that, in the latter case, the Board is involved in supervising the selection of a bargaining representative for the bargaining unit. See Gorman, Labor Law, at 46–49. In contrast, where, as in this case, a union already has been selected and is entitled to a presumption of majority support, the Board's involvement is more limited.

sor to apply than is the "substantial and representative complement." In fact, given the expansionist dreams of many new entrepreneurs, it might well be more difficult for a successor to identify the moment when the "full complement" has been attained, which is when the business will reach the limits of the new employer's initial hopes, than it would be for this same employer to acknowledge the time when its business has begun normal production—the moment identified by the "substantial and representative complement" rule.[18]

---

[18] In addition, even if an employer were to err as to the "substantial and representative complement" date and thus were to recognize the union prematurely, its good-faith violation of § 8(a)(2) would be subject only to a remedial order. See *Garment Workers* v. *NLRB*, 366 U. S. 731, 740 (1961). Similarly, we assume that if the employer were to refuse to recognize a union on the basis of its reasonable good-faith belief that it had not yet hired a "substantial and representative complement," the Board would likewise enter a remedial order, see *ibid.*, with no collateral consequences such as a decertification bar. Finally, if the employer has a good-faith doubt about the union's continuing majority status, it has several remedies available to it. See n. 8, *supra*.

Petitioner in its brief offers, as support for its position that its employees, once they reached "full complement," were opposed to the Union, certain employee petitions signed three days before the Board hearing on May 2, 1983. Brief for Petitioner 25; App. 364–367. We approve the Board's and Court of Appeals' treatment of these petitions. The ALJ ruled that such petitions were not relevant to petitioner's good-faith doubt about the Union's majority status at the mid-January date when petitioner's bargaining obligation arose. *Id.*, at 177–178. The Court of Appeals observed that "once it has been determined that an employer has unlawfully withheld recognition of an employees' bargaining representative, the employer cannot defend against a remedial bargaining by pointing to an intervening loss of employee support for the union when such loss of support is a foreseeable consequence of the employer's unfair labor practice." 775 F. 2d, at 433. That petitioner's refusal to bargain with the Union undermined the employees' support for the Union and thus led to the petitions is suggested by evidence in the record. An employee testified that the petitions were signed out of employees' fear that the Board proceeding might delay an expected wage raise. App. 183. Thus, the very refusal to bargain on petitioner's part that led to the unfair labor practice hearing produced the petitions on which petitioner would rely.

We therefore hold that the Board's "substantial and representative complement" rule is reasonable in the successorship context. Moreover, its application to the facts of this case is supported by substantial record evidence. The Court of Appeals observed that by mid-January petitioner "had hired employees in virtually all job classifications, had hired at least fifty percent of those it would ultimately employ in the majority of those classifications, and it employed a majority of the employees it would eventually employ when it reached full complement." 775 F. 2d, at 431–432. At that time petitioner had begun normal production. Although petitioner intended to expand to two shifts, and, in fact, reached this goal by mid-April, that expansion was contingent expressly upon the growth of the business. Accordingly, as found by the Board and approved by the Court of Appeals, mid-January was the period when petitioner reached its "substantial and representative complement." Because at that time the majority of petitioner's employees were former Sterlingwale employees, petitioner had an obligation to bargain with the Union then.

## C

We also hold that the Board's "continuing demand" rule is reasonable in the successorship situation. The successor's duty to bargain at the "substantial and representative complement" date is triggered only when the union has made a bargaining demand. Under the "continuing demand" rule, when a union has made a premature demand that has been rejected by the employer, this demand remains in force until the moment when the employer attains the "substantial and representative complement." See, e. g., Aircraft Magnesium, 265 N. L. R. B., at 1345, n. 9; Spruce Up Corp., 209 N. L. R. B. 194, 197 (1974), enf'd, 529 F. 2d 516 (CA4 1975).

Such a rule, particularly when considered along with the "substantial and representative complement" rule, places a minimal burden on the successor and makes sense in light of the union's position. Once the employer has concluded that

it has reached the appropriate complement, then, in order to determine whether its duty to bargain will be triggered, it has only to see whether the union already has made a demand for bargaining. Because the union has no established relationship with the successor and because it is unaware of the successor's plans for its operations and hiring, it is likely that, in many cases, a union's bargaining demand will be premature. It makes no sense to require the union repeatedly to renew its bargaining demand in the hope of having it correspond with the "substantial and representative complement" date, when, with little trouble, the employer can regard a previous demand as a continuing one.[19]

The reasonableness of the "continuing demand" rule is demonstrated by the facts of this case. Although the Union had asked Ansin to inform it about his plans for Sterlingwale so that it could become involved in the employer transition, the Union learned about this transition only after it had become a *fait accompli*. Without having any established relationship with petitioner, it therefore is not surprising that the Union's October bargaining demand was premature. The Union, however, made clear after this demand that, in its view, petitioner had a bargaining obligation: the Union filed an unfair labor practice charge in November. Petitioner responded by denying that it had any duty to bargain. Rather than being a successor confused about when a bargaining obligation might arise, petitioner took an initial posi-

---

[19] In contrast, in the situation where a union has not yet been recognized as a representative of a bargaining unit, the rationale for the "continuing demand" rule is not so compelling as it is in the successorship context where a union is entitled to a presumption of majority status and where the employer simply has to determine whether, at the appropriate date, the predecessor's employees are in the majority. In the initial recognition context the union, not the employer, is in the best position to have access to the relevant information—whether the union has the majority support of the employees.

tion—and stuck with it—that it *never* would have any bargaining obligation with the Union.[20]

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE POWELL, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, dissenting.

Today the Court holds that petitioner Fall River Dyeing & Finishing Corp. violated §§ 8(a)(1) and (a)(5) of the National Labor Relations Act, 29 U. S. C. §§ 158(a)(1), (5) (NLRA), by refusing to bargain with a union that claims to represent its workers. The Court agrees with the National Labor Relations Board (NLRB or Board) that this duty to bargain arose because petitioner is a "successor" to Sterlingwale Corp., a defunct entity that had engaged in a similar line of business. The Court also agrees that the duty to bargain arose when petitioner had brought its first shift into full operation. The theory is that petitioner then had hired a "substantial and representative complement" of its work force. In my view, the Court has misconstrued the successorship doctrine and misapplied the substantial complement test. Accordingly, I dissent.[1]

---

[20] Although the unfair labor practice charge was filed and the complaint issued before mid-January when petitioner's obligation arose and the violation occurred, an unfair labor practice proceeding may be based on actions following the filing of a complaint. See *Curtiss-Wright Corp., Wright Aeronautical Div.* v. *NLRB,* 347 F. 2d 61, 73–74 (CA3 1965).

[1] As a preliminary matter, the Court holds that if one company is a successor to another, it has an obligation to bargain with the prior company's union even though that union had not been certified recently by the workers. *Ante,* at 41. As the Court notes, the finding of successorship in *NLRB* v. *Burns International Security Services, Inc.,* 406 U. S. 272 (1972), was based partly on the fact that the union had been certified almost immediately before the employees were hired by the new company. *Id.,* at 278. Although the Court concludes that the successorship doctrine is not limited to such cases, it certainly would be reasonable to assume that the more remote the certification, the weaker the presumption should be that the union retains majority support. In any event, I do not reach the

## I

## A

Although the Court describes the background of this case in great detail, it gives insufficient consideration to a number of critical facts. On February 12, 1982, a financially troubled Sterlingwale ceased operations and indefinitely laid off its production workers, retaining only a skeleton crew to ship out the remaining orders and liquidate the inventory. The collective-bargaining agreement (CBA) between the union and Sterlingwale was allowed to expire in April, and the company ceased paying the workers' life and health insurance premiums. Attempts to obtain new financing to keep the business afloat were unsuccessful. Sterlingwale commenced its liquidation by making an assignment for the benefit of creditors, and then hired a professional liquidator to sell the remaining assets at a public auction. By mid to late summer of 1982, all business activity had ceased, and the company permanently closed its doors.

Petitioner Fall River Dyeing & Finishing Corp. was incorporated at the end of August 1982. It bought most of Sterlingwale's machinery, furniture, and fixtures. It also bought a portion of the Sterlingwale inventory at the public auction.[2] Three weeks later it began recruiting new employees by placing ads in the local newspaper. Petitioner hired some former Sterlingwale workers, although by no means all or even a large percentage of those who had been laid off.[3] When making its hiring decisions, petitioner took

---

issue because I think it is clear that petitioner is not a successor to Sterlingwale.

[2] At the auction, that apparently took place in October 1982, petitioner bought $13,000 worth of inventory out of the $30,000 worth that was sold. App. 200–201.

[3] More than 150 workers were laid off in February 1982; by mid-January 1983, petitioner had hired perhaps 36 of them. See App. 92–93; 775 F. 2d 425, 428 (CA1 1985). The record does not reveal how many of the laid-off Sterlingwale workers applied for positions with the new company, al-

into account the applicant's experience with *either* Sterling-wale or other finishing plants, App. 223; although the former Sterlingwale supervisors who had been hired were consulted as to the former Sterlingwale workers who applied, there is no finding that these workers as a group received a hiring preference. Once the new company began operations in November 1982, it performed commission finishing work exclusively, rather than the converting finishing that had accounted for 60%–70% of Sterlingwale's business.[4]

## B

Of course, a decision by the NLRB that one company is a successor of another is entitled to deference, and its conclusions will be upheld if they are based on substantial record evidence. See *Golden State Bottling Co.* v. *NLRB*, 414 U. S. 168, 181 (1973). The critical question in determining successorship is whether there is "substantial continuity" between the two businesses. *Aircraft Magnesium, Division of Grico Corp.*, 265 N. L. R. B. 1344, 1345 (1982), enf'd, 730 F. 2d 767 (CA9 1984). See also *NLRB* v. *Burns International Security Services, Inc.*, 406 U. S. 272, 279–281 (1972). Here the Board concluded that there was sufficient

---

though petitioner's vice president testified that he received what "seemed like thousands" of applications in response to the ads. App. 198.

[4] The Court finds little significance in this switch from converting to commission work, since the change was thought to have no direct effect on the employer-employee relationship. See *ante*, at 46, n. 11. This difference alone would not be determinative, but it hardly is irrelevant. The change meant that unlike petitioner, Sterlingwale did not have to maintain a sales force or retail outlet to sell its cloth, nor did it have to allocate capital for purchasing material. These facts are pertinent to the question whether there is substantial continuity between the two enterprises. The Board in the past has recognized the significance of similar considerations that have an indirect impact on the workers. See, *e. g.*, *Gladding Corp.*, 192 N. L. R. B. 200, 202 (1971) (change in suppliers); *Radiant Fashions, Inc.*, 202 N. L. R. B. 938, 940 (1973) (substantial change in identity of customers).

continuity between petitioner and Sterlingwale, primarily because the workers did the same finishing work on the same equipment for petitioner as they had for their former employer. See 272 N. L. R. B. 839, 840 (1984) (decision of Administrative Law Judge (ALJ)). In reaching this conclusion, however, the Board, and now the Court, give virtually no weight to the evidence of *dis*continuity, that I think is overwhelming.

In this case the undisputed evidence shows that petitioner is a completely separate entity from Sterlingwale. There was a clear break between the time Sterlingwale ceased normal business operations in February 1982 and when petitioner came into existence at the end of August.[5] In addition, it is apparent that there was no direct contractual or other business relationship between petitioner and Sterlingwale. See App. 205. Although petitioner bought some of Sterlingwale's inventory, it did so by outbidding several other buyers on the open market. Also, the purchases at the public sale involved only tangible assets. Petitioner did not buy Sterlingwale's trade name or goodwill, nor did it assume any of its liabilities. And while over half of petitioner's business (measured in dollars) came from former Sterlingwale customers, apparently this was due to the new company's skill in marketing its services. There was no sale or transfer of customer lists, and given the 9-month interval between the time that Sterlingwale ended production and petitioner commenced its operations in November, the natural conclusion is that the new business attracted customers through its own efforts. No other explanation was offered. Cf. *Lincoln Private Police, Inc.*, 189 N. L. R. B. 717, 719 (1971) (finding it relevant to the successorship question that, while the new

---

[5] The Court dismisses the effect of this 7-month hiatus, stating that such a break is important only if there are "other indicia of discontinuity." *Ante*, at 45 (citing *NLRB* v. *Band-Age, Inc.*, 534 F. 2d 1, 5 (CA1), cert. denied, 429 U. S. 921 (1976)). Of course, as noted in the text, there are a number of other "indicia of discontinuity" in this case.

business acquired many of the former company's clients, "it did so by means of independent solicitation"). Any one of these facts standing alone may be insufficient to defeat a finding of successorship, but together they persuasively demonstrate that the Board's finding of "substantial continuity" was incorrect.[6]

The Court nevertheless is unpersuaded. It views these distinctions as not directly affecting the employees' expectations about their job status or the status of the union as their representative, even though the CBA with the defunct corporation had long since expired. See *Golden State Bottling Co.* v. *NLRB, supra,* at 184 (emphasizing the importance of the workers' perception that their job situation continues "essentially unaltered"). Yet even from the employees' perspective, there was little objective evidence that the jobs with petitioner were simply a continuation of those at Sterlingwale. When all of the production employees were laid off indefinitely in February 1982, there could have been little hope—and certainly no reasonable expectation—that Sterlingwale would ever reopen. Nor was it reasonable for the employees to expect that Sterlingwale's failed textile operations would be resumed by a corporation not then in existence. The CBA had expired in April with no serious effort to renegotiate it, and with several of the employees' benefits left unpaid. The possibility of further employment with Sterlingwale then disappeared entirely in August 1982 when

---

[6] The case before us bears a substantial resemblance to *Radiant Fashions, Inc., supra.* In that case, the alleged successor was engaged in a business similar to that of its predecessor, at the same location, with the same equipment, the same supervisory personnel, and a reduced but similar work force. The Board nevertheless ruled that the company was not a successor. It based its conclusion on four factors: (i) there was a "lengthy" hiatus of 2½ to 3 months between the time the first company shut down and the second company began production; (ii) the second company bought only the assets of the first business, rather than an ongoing enterprise; (iii) the second company served a different market; and (iv) there was no transfer of customers as a result of the sale. 202 N. L. R. B., at 940–941.

the company liquidated its remaining assets. Cf. *Textile Workers* v. *Darlington Manufacturing Co.*, 380 U. S. 263, 274 (1965) (the "closing of an entire business . . . ends the employer-employee relationship"). After petitioner was organized, it advertised for workers in the newspaper, a move that hardly could have suggested to the old workers that they would be reinstated to their former positions. The sum of these facts inevitably would have had a negative "effect on the employees' expectations of rehire." See *Aircraft Magnesium*, 265 N. L. R. B., at 1346. See also *Radiant Fashions, Inc.*, 202 N. L. R. B. 938, 940 (1973). The former employees engaged by petitioner found that the new plant was smaller, and that there would be fewer workers, fewer shifts, and more hours per shift than at their prior job. Moreover, as petitioner did not acquire Sterlingwale's personnel records, the benefits of having a favorable work record presumably were lost to these employees.

In deferring to the NLRB's decision, the Court today extends the successorship doctrine in a manner that could not have been anticipated by either the employer or the employees. I would hold that the successorship doctrine has no application when the break in continuity between enterprises is as complete and extensive as it was here.

## II

Even if the evidence of genuine continuity were substantial, I could not agree with the Court's decision. As we have noted in the past, if the presumption of majority support for a union is to survive a change in ownership, it must be shown that there is both a continuity of conditions *and* a continuity of work force. *Howard Johnson Co.* v. *Hotel Employees*, 417 U. S. 249, 263 (1974). This means that unless a majority of the new company's workers had been employed by the former company, there is no justification for assuming that the new employees wish to be represented by the former union, or by any union at all. See *Spruce Up Corp.*, 209

N. L. R. B. 194, 196 (1974), enf'd, 529 F. 2d 516 (CA4 1975); 209 N. L. R. B., at 200 (member Kennedy, concurring in part and dissenting in part); *Saks & Co.* v. *NLRB*, 634 F. 2d 681, 685–686 (CA2 1980). Indeed, the rule hardly could be otherwise. It would be contrary to the basic principles of the NLRA simply to presume in these cases that a majority of workers supports a union when more than half of them have never been members, and when there has been no election.

The Court acknowledges that when petitioner completed the employment of its anticipated work force in April 1983, less than 50% of its employees formerly had worked for Sterlingwale. It nevertheless finds that the new company violated its duty to bargain, because at an earlier date chosen by the Board, a majority of the work force formerly had worked for Sterlingwale. The NLRB concluded that even though petitioner was still in the process of hiring employees, by the middle of January it had hired a "substantial and representative complement," when its first shift was adequately staffed and most job categories had been filled.

In my view, the Board's decision to measure the composition of petitioner's work force in mid-January is unsupportable. The substantial and representative complement test can serve a useful role when the hiring process is sporadic, or the future expansion of the work force is speculative. But as the Court recognized in *NLRB* v. *Burns International Security Services, Inc.*, in some cases "it may not be clear until the successor employer has hired his full complement of employees that he has a duty to bargain with a union, since it will not be evident until then that the bargaining representative represents a majority of the employees in the unit." 406 U. S., at 295. Indeed, where it is feasible to wait and examine the full complement—as it was here—it clearly is fairer to both employer and employees to do so. The substantial complement test provides no more than an *estimate* of the percentage of employees from the old company that eventually will be part of

the new business, and thus often will be an imperfect measure of continuing union support. The risks of relying on such an estimate are obvious. If the "substantial complement" examined by the Board at a particular time contains a disproportionate number of workers from the old company, the result either might be that the full work force is deprived of union representation that a majority favors, or is required to accept representation that a majority does not want. Accordingly, unless the delay or uncertainty of future expansion would frustrate the employees' legitimate interest in early representation—a situation not shown to exist here—there is every reason to wait until the full anticipated work force has been employed.

In this case the date chosen by the NLRB for measuring the substantial complement standard is unsupportable, and the Court's affirmance of this choice, curious. In prior decisions, courts and the Board have looked not only to the *number* of workers hired and positions filled on a particular date, but also to "the time expected to elapse before a substantially larger complement would be at work . . . as well as the relative certainty of the employer's expected expansion." *Premium Foods, Inc.* v. *NLRB*, 709 F. 2d 623, 628 (CA9 1983). See also *St. John of God Hospital, Inc.*, 260 N. L. R. B. 905 (1982). Here the anticipated expansion was both imminent and reasonably definite. The record shows that in January petitioner both expected to, and in fact subsequently did, hire a significant number of new employees to staff its second shift. Although the Court finds that the growth of the work force was "contingent" on business conditions, neither the ALJ nor the NLRB made such a finding.[7] In fact, they both noted that by January 15, the second shift already had begun limited operations. See 272 N. L. R. B., at 839, n. 1 ("In

---

[7] The evidence shows that in the textile industry, two shifts are necessary for proper finishing work. See 775 F. 2d 425, 428 (CA1 1985). See also App. 227. Thus, it was clear in mid-January that petitioner would need more employees in the immediate future.

mid-January [petitioner] had one shift in full operation and had started a second shift"); *id.*, at 840. In fact, less than three months after the duty to bargain allegedly arose, petitioner had nearly doubled the size of its mid-January work force by hiring the remaining 50-odd workers it needed to reach full production. This expansion was not unexpected; instead, it closely tracked petitioner's original forecast for growth during its first few months in business.[8] Thus there was no reasonable basis for selecting mid-January as the time that petitioner should have known that it should commence bargaining.[9]

As the Court notes, the substantial complement rule reflects the need to balance "the objective of insuring maximum employee participation in the selection of a bargaining agent against the goal of permitting employees to be represented as quickly as possible." *Ante*, at 48 (citations and internal

---

[8] Petitioner's vice president of operations testified:

"We planned to have a full one shift operation of 55 to 60 employees. And after we reached that goal, and then we'd see how business would be, and then we'd had *[sic]* planned that by the end of March, April, we should be in a full two shift operation and up to our expected production." App. 208.

There is no evidence that business conditions during this period were such that the company considered changing its hiring goal.

[9] The NLRB's reliance on the substantial complement standard is particularly puzzling on these facts, since the evidence shows that the "substantial" complement examined by the Board was not truly "representative" of the work force. When the unfair labor practice hearing was held on May 2, 1983, petitioner already had hired a full complement of workers. At that point the company employed 106–109 workers, less than half of whom were former Sterlingwale employees. Rather than rely on this accurate measure of the composition of the work force, the ALJ looked back to the middle of January, and concluded that petitioner should have acted differently because it *appeared* at the time that most of the workers who eventually would be represented by the union would be ex-Sterlingwale employees. In other words, the Board ruled that petitioner violated the NLRA because it failed to make the same estimate in January that the ALJ made in May—an estimate that already had proved to be erroneous at the time that the ALJ made it.

quotation marks omitted). The decision today "balances" these interests by overprotecting the latter and ignoring the former. In an effort to ensure that some employees will not be deprived of representation for even a short time, the Court requires petitioner to recognize a union that has never been elected or accepted by a majority of its workers. For the reasons stated, I think that the Court's decision is unfair both to petitioner, who hardly could have anticipated the date chosen by the Board, and to most of petitioner's employees, who were denied the opportunity to choose their union. I dissent.