United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued December 11, 1997 Decided January 23, 1998 

 No. 96-1326

 Harter Tomato Products Company, 

 Petitioner/Cross-Respondent

 v.

 National Labor Relations Board, 

 Respondent/Cross-Petitioner

 On Petition for Review and Cross-Application for

 Enforcement of an Order of the

 National Labor Relations Board

 Warren Davison argued the cause for petitioner/cross-
respondent. With him on the briefs was Mary E. Bruno.

 David A. Seid, Attorney, National Labor Relations Board, 
argued the cause for respondent/cross-petitioner. With him 
on the brief were Linda Sher, Associate General Counsel, 


Aileen A. Armstrong, Deputy Associate General Counsel, and 
Fred Cornnell, Supervisory Attorney.

 Before: Williams, Henderson and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Tatel.

 Tatel, Circuit Judge: After a company which processed 
tomato paste, tomatoes, and other fruits halted operations, 
petitioner leased all of its facilities, continuing only tomato 
paste processing. Applying the successorship doctrine, the 
National Labor Relations Board found that petitioner com-
mitted an unfair labor practice by refusing to bargain with 
the union recognized by the predecessor. Agreeing with the 
Board that direct purchase of the predecessor's assets is not a 
prerequisite for successor status and finding that the Board's 
application of the successorship test is supported by substan-
tial evidence, we deny the petition for review and grant the 
Board's cross-application for enforcement.

 I

 Harter, Inc., the predecessor company, processed industrial 
tomato paste, prunes, canned tomatoes, and canned peaches 
in Yuba City, California. Employing about 1200 people, 
Harter was a member of a multiemployer association that 
entered into a series of collective bargaining agreements with 
the International Brotherhood of Teamsters, an association 
composed of various labor organizations, including Cannery, 
Dried Fruit & Nut Workers' Union, Local 849.

 In July 1993, Harter sold its facilities and equipment--
including a tomato paste processing plant, a nonoperational 
whole peeled tomato canning plant, a building for processing 
peaches and prunes, and a warehouse--to a general partner-
ship which then leased them to petitioner Harter Tomato 
Products Company ("HTPC"), a recently incorporated enter-
prise previously unrelated to Harter. Through the lease, 
HTPC also obtained the right to use the "Harter" corporate 
name.


 Like its predecessor, HTPC processes tomato paste, using 
the same equipment and production methods previously em-
ployed by Harter. Unlike Harter, HTPC processes no toma-
toes, peaches, or prunes. During the 1993 season, HTPC 
employed about seventy people, two-thirds of whom had 
previously worked for Harter; it also employed seven former 
Harter managers--including its general manager, chief finan-
cial officer, and tomato processing plant manager--as its 
administrative team. Nearly sixty percent of HTPC's cus-
tomers previously bought tomato paste from Harter. HTPC 
produced almost the same amount of tomato paste, making 
nearly the same amount of money from its tomato paste sales 
as Harter had in the previous year.

 About two weeks after HTPC began processing tomato 
paste, the Union asked HTPC to recognize and bargain with 
it as the exclusive representative of HTPC's employees. 
HTPC refused. Instead, it filed a petition for a Board-
conducted election. The Board held HTPC's petition in 
abeyance because the day after the company filed it, the 
Union charged HTPC with violating sections 8(a)(1) and (5) of 
the National Labor Relations Act, 29 U.S.C. s 158(a)(1), (5) 
(1994), which prohibit employers from "refus[ing] to bargain 
collectively with the representatives of [their] employees." 
Id. s 158(a)(5). Some two weeks later, HTPC's employees 
signed a petition stating that they no longer wished to be 
represented by the Union.

 On May 8, 1995, an Administrative Law Judge found that 
HTPC was a successor to Harter and had therefore violated 
the Act by refusing to bargain with the Union. Appealing to 
the Board, Harter argued that the successorship doctrine 
should not apply when the alleged successor merely leases 
the assets of the predecessor company, that the ALJ failed to 
consider important differences between the two companies in 
finding successor status, and that HTPC believed in good 
faith that a majority of its employees no longer supported the 
Union. The Board rejected all of these arguments. To begin 
with, it held that "the direct transfer of assets to the succes-
sor is not a prerequisite to [successor] status" and that HTPC 
was "clear[ly]" a successor employer. Harter Tomato Prod-


ucts Co., 321 NLRB 901, 901-902 (1996). In reaching this 
conclusion and analyzing the transition from Harter to HTPC 
from the employees' perspective, the Board found that HTPC 
"took over a distinct segment of Harter Inc.'s business, 
operating it in the same manner using the same equipment 
and the same employees, selling to many of the same custom-
ers, with no hiatus in operations." Id. at 903. The Board 
also found that HTPC's election petition and the employees' 
anti-union petition were "tainted by [HTPC's] unfair labor 
practice and ... not reliable indicators of the employees' 
sentiments." Id. at 903 n.16.

 HTPC now petitions for review of the Board's order. The 
Board cross-applies for enforcement. We review the Board's 
factual conclusions for substantial evidence, Universal Cam-
era Corp. v. NLRB, 340 U.S. 474, 488 (1951), defer to NLRB 
rules if they are "rational and consistent with the Act," Fall 
River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 42 
(1987), and uphold the Board's application of law to facts 
unless arbitrary or otherwise erroneous, Teamsters Local 
Union No. 515 v. NLRB, 906 F.2d 719, 722 (D.C. Cir. 1990).

 II

 The National Labor Relations Act's overriding purpose is 
the promotion of "industrial peace." Brooks v. NLRB, 348 
U.S. 96, 103 (1954). To achieve this goal, a union certified 
by the Board as a bargaining-unit representative enjoys a 
conclusive presumption of majority status for one year and a 
rebuttable presumption thereafter. NLRB v. Burns Int'l 
Sec. Servs., Inc., 406 U.S. 272, 279 n.3 (1972). An employer 
can rebut this presumption if on the basis of objective evi-
dence, it has a good faith belief that the union no longer 
enjoys majority support. Lee Lumber and Bldg. Material 
Corp. v. NLRB, 117 F.3d 1454, 1458 (D.C. Cir. 1997). Be-
cause transitions from one employer to another are particu-
larly threatening to industrial peace, the rebuttable pre-
sumption of majority status continues despite a change of 
employers. Fall River, 482 U.S. at 39-41. Moreover, "the 
new employer has an obligation to bargain with [the] union 


so long as the new employer is in fact a successor of the old 
employer and the majority of its employees were employed 
by its predecessor." Id. at 41.

 The successorship question turns on whether, in view of the 
"totality of the circumstances," there is "substantial continui-
ty" between the new and predecessor employers. Id. at 43. 
More specifically--and central to this case--the Board asks 
whether the new company " 'acquired substantial assets of its 
predecessor and continued, without interruption or substan-
tial change, the predecessor's business operations.' " Id. 
(quoting Golden State Bottling Co. v. NLRB, 414 U.S. 168, 
184 (1973)). To answer this inquiry, the Board must consider 
"a number of factors," including "whether the business of 
both employers is essentially the same; whether the employ-
ees of the new company are doing the same jobs in the same 
working conditions under the same supervisors; and whether 
the new entity has the same production process, produces the 
same products, and basically has the same body of custom-
ers." Id. at 43. The ultimate question is this: Will the 
employees "understandably view their job situations as essen-
tially unaltered"? Golden State Bottling, 414 U.S. at 184; see 
also International Union of Petroleum & Indus. Workers. v. 
NLRB, 980 F.2d 774, 779 (D.C. Cir. 1992) ("The fact-intensive 
inquiry into 'substantial continuity' is undertaken with an 
emphasis on the employees' perspective.") (quoting Fall Riv-
er, 482 U.S. at 43).

 Emphasizing Fall River's use of the word "acquired," 
HTPC argues that it cannot be a successor because it only 
leased Harter's assets from a third party rather than pur-
chasing them directly from Harter. Like the Board, we 
disagree. Nothing in the definition of "acquire"--"to come 
into possession, control, or power of disposal of often by some 
uncertain or unspecified means"--excludes leasing as a means 
of obtaining control. Webster's Third New International 
Dictionary of the English Language Unabridged 18 (1993). 
Although we have never squarely addressed this question, 
two of our sister circuits have held that a direct purchase of 
assets is not a prerequisite for successorship. See NLRB v. 
Houston Bldg. Serv., Inc., 936 F.2d 178, 180-81 & n.2 (5th 


Cir. 1991) (finding successorship when new company took 
over services contract of the predecessor but did not acquire 
predecessor's assets); Saks & Co. v. NLRB, 634 F.2d 681, 687 
(2nd Cir. 1980) ("[W]hile a transfer of assets may be evidence 
of the requisite continuity of business operations, it has not 
been thought to be a necessary condition ...."). HTPC's 
rigid definition of "acquired," moreover, conflicts with Fall 
River's twin holdings that the Board must examine "a num-
ber of factors" when determining successorship and that the 
inquiry's touchstone is whether the employees perceive their 
job situations as essentially unchanged. Fall River, 482 U.S. 
at 43. We therefore hold that if other factors demonstrate 
substantial continuity and if employees perceive their new 
jobs as highly similar the fact that the second company leased 
the assets of its predecessor from a third party rather than 
purchasing them directly from the predecessor does not 
preclude the Board from finding successorship status. See 
id. at 44 n.10 ("So long as there are other indicia of 'substan-
tial continuity,' the way in which a successor obtains the 
predecessor's assets is generally not determinative of the 
'substantial continuity' question.").

 HTPC next argues that the Board misapplied the succes-
sorship test, claiming that the agency " 'effectively disregard-
ed' the substantial continuity prong of the successorship 
analysis." Again, we disagree. Drawing its factual findings 
from the parties' joint stipulation of facts, the Board faithfully 
applied Fall River's multifactored successorship test, analyz-
ing the results from the perspective of HTPC's employees. 
The Board found many factors weighing in favor of successor-
ship: HTPC leased Harter's facilities, used its equipment, 
engaged in tomato paste processing, employed the same 
production method as Harter, hired Harter's management 
team for similar positions, and sold to Harter's customers. A 
majority of HTPC's employees previously worked for Harter, 
and HTPC began its operation shortly after Harter went out 
of business. Harter Tomato, 321 NLRB at 902-03. Given 
these many similarities, we find the Board's successorship 
conclusion supported by substantial evidence and neither 
unreasonable nor arbitrary.


 Pointing to differences in size, wages, benefits, training, 
customer base, managerial philosophy, and supplier contracts, 
among others, HTPC argues that the two companies are 
substantially dissimilar and that HTPC's employees would 
perceive a material difference between the two. Though 
plausible, this argument is unresponsive to the question we 
face. We ask not whether HTPC's view of the facts supports 
its version of what happened, but rather whether the Board's 
interpretation of the facts is " 'reasonably defensible.' " 
Pittsburgh Press Co. v. NLRB, 977 F.2d 652, 654 (D.C. Cir. 
1992) (quoting Ford Motor Co. v. NLRB, 441 U.S. 488, 497 
(1979)). If so, the case is over, even if HTPC's version might 
support a contrary result. Because we find that the Board 
reached a reasonable conclusion based on evidence in the 
record, we need not consider HTPC's alternative interpreta-
tion. See International Union of Elec., Radio & Mach. 
Workers v. NLRB, 604 F.2d 689, 694-95 (D.C. Cir. 1979) 
(internal organizational alterations do not preclude successor-
ship finding when other factors are present).

 III

 HTPC argues that, even if it were a successor, it had no 
obligation to recognize the Union (and that its election peti-
tion should proceed) because it had a good faith belief that 
the Union no longer enjoyed majority support among its 
employees. According to the Board, the employees' anti-
union petition, on which HTPC primarily relies for its asser-
tion of good-faith, was tainted by HTPC's refusal to bargain. 
Harter Tomato, 321 NLRB at 903 n.16. We have specifically 
upheld the Board's presumption that an employer's unlawful 
refusal to bargain taints a subsequent anti-union petition. 
Lee Lumber, 117 F.3d at 1458-59. We have also upheld its 
ruling that an employer can rebut this presumption only by 
showing that employee disaffection arose after it resumed 
recognition of the union and bargained for a reasonable time 
without committing additional unfair practices adversely af-
fecting the bargaining, id. at 1458, a situation quite unlike this 
case.


 Relying on the Board's holding that the rebuttable pre-
sumption will not operate in "unusual circumstances," Lee 
Lumber and Bldg. Material Corp., 322 NLRB 175, 178 & n.24 
(1996), aff'd in part and remanded in part, 117 F.3d 1454 
(D.C. Cir. 1997), HTPC argues that the presumption should 
not apply here because, among other reasons, "the size of the 
bargaining unit fluctuated radically within a short time." But 
HTPC failed to present this argument to the Board. Al-
though the Board issued Lee Lumber approximately three 
weeks after its decision in this case, HTPC could have filed a 
petition for rehearing. Having failed to do so, it cannot 
present its argument here. 29 U.S.C. s 160(e) (1994) ("No 
objection that has not been urged before the Board ... shall 
be considered by [a reviewing] court [absent] extraordinary 
circumstances."); Woelke & Romero Framing, Inc. v. NLRB, 
456 U.S. 645, 666 (1982).

 HTPC's final argument, that it had a good faith belief in 
the Union's nonmajority status because it leased Harter's 
assets and because its workforce was smaller than Harter's, 
suffers from the same defect. Although advancing this argu-
ment to the Board in general terms, HTPC never identified 
specific reasons for its good faith belief, contending only that 
it rested on "objective evidence" and "objective factors." 
Because HTPC failed to present this argument to the Board 
clearly enough, we cannot consider it now. Consolidated 
Freightways v. NLRB, 669 F.2d 790, 793 (D.C. Cir. 1981) 
("Cases interpreting section 10(e) look to whether a party's 
exceptions are sufficiently specific to apprise the Board that 
an issue might be pursued on appeal.").

 We deny the petition for review and grant the Board's 
cross-application for enforcement.

So ordered.