United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued January 27, 1998 Decided July 17, 1998 

 No. 97-1170

 Capital Cleaning Contractors, Inc., 

 Petitioner/Cross-Respondent

 v.

 National Labor Relations Board, 

 Respondent/Cross-Petitioner

 On Petition for Review and Cross-Application

 for Enforcement of an Order of the

 National Labor Relations Board

 Frederick D. Braid argued the cause for petitioner/cross-
respondent, with whom James F. Kenniff was on the briefs.

 Ana L. Avendano, Attorney, National Labor Relations 
Board, argued the cause for respondent/cross-petitioner, with 
whom Frederick L. Feinstein, General Counsel, Linda R. 
Sher, Associate General Counsel, Aileen A. Armstrong, Depu-


ty Associate General Counsel, and Fred L. Cornnell, Supervi-
sory Attorney, were on the brief.

 Before: Ginsburg, Henderson, and Randolph, Circuit 
Judges.

 Opinion for the Court filed by Circuit Judge Ginsburg.

 Ginsburg, Circuit Judge: Capital Cleaning Contractors, 
Inc. petitions for review, and the National Labor Relations 
Board cross-applies for enforcement, of a Board order holding 
that Capital is a successor employer within the meaning of 
NLRB v. Burns International Security Services, Inc., 406 
U.S. 272 (1972). The Board held that Capital violated 
ss 8(a)(1), (3), and (5) of the National Labor Relations Act, 29 
U.S.C. ss 158(a)(1), (3), and (5), by discriminating in hire 
against the unionized employees of its predecessor, refusing 
to bargain with their union, and establishing without consult-
ing the union the terms and conditions of employment it 
would offer initially to the union employees of its predecessor. 
Capital argues that (1) the Board's finding that Capital was a 
successor because it acted with anti-union animus in refusing 
to hire union workers is not supported by substantial evi-
dence; (2) under Burns it was entitled to establish the terms 
and conditions of employment it would offer initially to the 
employees of its predecessor; and (3) the Board's remedial 
order is punitive. For the reasons stated below we reject 
Capital's first two arguments but agree that the Board's 
order is punitive; therefore, we grant in part and deny in 
part both the Company's petition for review and the Board's 
application for enforcement.

 I. Background

 Until May 2, 1992 Ogden Allied Corporation had a contract 
to clean the Bulova Corporate Center in Queens, New York, 
for which purpose it employed 19 people. Local 32B-32J, 
Service Employees International Union, AFL-CIO was the 
exclusive bargaining representative of the Ogden cleaning 
employees. The collective bargaining agreement (CBA) be-
tween Ogden and Local 32 for the years 1990 through 1992 

provided for wages of between $8.50 and $9.50 per hour and 
for medical and pension benefits.

 In the Spring of 1992 the management of the Bulova 
building solicited competitive bids for a new cleaning contract. 
During the bidding process the manager of the building told 
Dennis Kaplan, the vice-president of Capital, that he was not 
pleased with the quality of the work Ogden had done. On 
April 10, 1992 Capital won the contract, and the Bulova 
building became Capital's largest job. As was its general 
practice, Capital staffed the building with a subcontractor, in 
this instance KCR Maintenance. Because Kaplan was con-
cerned that KCR would not be able fully to staff the Bulova 
building, however, he and KCR agreed that he could also hire 
some of the Ogden employees to continue working there. 
Indeed, Kaplan testified that because hiring the Ogden em-
ployees "could have made a very smooth transition," he would 
have hired all of them if they had passed the screening 
interview and if building management had approved.

 Also on April 10 Anthony Spataro, the business agent of 
Local 32, learned about the Bulova building's switch from 
Ogden to Capital. According to Spataro, on April 14 he gave 
the Ogden employees copies of Capital's advertisement in the 
Yellow Pages and instructed them to call Capital and apply 
for a job. On April 15 Spataro drove to Capital's office in 
Huntington Station, New York and gave Al Kaplan, the 
president of Capital, a letter from the Union. The letter 
informed Capital that the Union represented the 19 Ogden 
employees; on their behalf it was making an "unconditional 
application for continued employment"; and it requested that 
Capital contact the Union's law firm "to commence negotia-
tions." Dennis Kaplan testified that this request "seemed a 
little rough to us" because it was not a practice with which he 
was familiar and because Capital usually staffed a building 
with its own people. Spataro testified that he called Capital 
four times in mid-April and left messages for Dennis Kaplan, 
who never called back.

 On or about April 20 Dennis Kaplan went to the Bulova 
Center with the following notice addressed to the Ogden 
employees:


 Effective May 2, 1992, we will be the new cleaning 
 company at the Bulova Building....

 Although a number of you have called our office, no 
 one has submitted an application for work. The union 
 which represents you with your current employer has 
 written to us and stated that it is making an "uncondi-
 tional application for continued employment" for every-
 one on a list which they enclosed. This is not sufficient 
 to apply for work with us. You must call our office at 
 [phone number] and ask for the Personnel Department. 
 Tell them you are working at the Bulova Building, and 
 that you are interested in applying for a job with us. 
 Make an appointment to fill out an employment applica-
 tion, and bring satisfactory proof that you may lawfully 
 be employed in this country. We will advise you of our 
 decision after we complete a reference check.

 Starting wages are $5.00 per hour. We do not provide 
 health insurance, and there is no pension.

Kaplan asked the building supervisor to distribute the notice 
to the Ogden employees and to post it near the employees' 
locker room. On April 27 Capital also mailed the notice to 
each Ogden employee by certified mail.

 Also on that date Capital's law firm wrote to the Union, 
enclosing the notice offering jobs to the Ogden employees, 
and reiterating that the Union's blanket application was not 
sufficient; each employee would have to apply individually in 
order to get a job. The letter also stated that if Capital hired 
a majority of union employees, then it would bargain with the 
Union.

 In the event, Capital did not hire any of the Ogden 
employees. At least three of the employees (Moore, Gallardo, 
and Mercado) testified that when they called Dennis Kaplan 
to apply for a job and informed him that they were Ogden 
employees, he said he was not hiring union workers. Others 
(including Diaz-Miranda, Mazurek, and Rojas) testified that 
Kaplan told them he did not need them because he was going 
to staff the job with his own people. Some of these employ-
ees in turn told their co-workers what Kaplan had told them.

 Several of the employees testified that they did not apply 
for a job with Capital because Kaplan indicated that he would 
not hire them. One of the employees said he did not apply 
because the salary was too low, another because there were 
no benefits. Only one of the employees set up an interview 
for the job, and she testified that after one of her co-workers 
related his conversation with Kaplan she decided not to keep 
her appointment.

 Dennis Kaplan testified that he spoke on the telephone 
with two or three Ogden employees about a job and told them 
about the application procedure. Kaplan told some of the 
callers that the job paid $5.00 with no benefits. Kaplan 
denied, however, that he told any of the Ogden employees 
that he was not hiring union members or that there were no 
positions because he was bringing in his own people.

 Capital took over the job on May 2. On May 6 the Ogden 
employees began picketing the building, which they continued 
to do through July.

 On July 23 the General Counsel of the Board issued a 
complaint against Capital. A hearing was held before an 
Administrative Law Judge in March 1993 and in December 
the ALJ issued her decision. After observing that "much of 
the instant case rests on credibility determinations," she 
determined that Dennis Kaplan was "not a credible witness." 
Acknowledging that there were inconsistencies in the testimo-
ny of the Ogden employees, she concluded that these were 
due to the passage of time and to the employees' lack of 
sophistication and education. The ALJ then found that al-
though two of the Ogden employees would not have applied 
for a job with Capital because of the low wage and lack of 
benefits, the other 17 would have applied and would have 
been hired by Capital but for its anti-union discrimination.

 The ALJ also concluded that Capital was a successor 
employer to Ogden and that it was liable under ss 8(a)(1) and 
(3) of the Act for refusing to hire union members, and under 
ss 8(a)(1) and (5) both for failing to recognize and bargain 
with the Union and for unilaterally setting the initial terms 
and conditions of employment. The ALJ ordered Capital to 


reinstate the 17 affected Ogden employees, to bargain with 
Local 32, and to restore retroactively the terms and condi-
tions of employment (including wages and benefits) called for 
in the 1990-92 CBA between Local 32 and Ogden. The wage 
and benefit remedy runs for the period from May 2, 1992 
until such time as Capital negotiates in good faith with Local 
32 and reaches either a new agreement or an impasse. The 
Board affirmed the ALJ's decision in all relevant respects.

 II. Analysis

 Capital asserts that the ALJ's conclusion that it discrimi-
nated against union members is not supported by substantial 
evidence and that therefore it is not a successor to Ogden. 
Capital also claims that regardless whether it is a successor it 
was entitled to set the initial terms and conditions of employ-
ment without first consulting with Local 32. Finally, Capital 
argues that the remedy imposed upon it is punitive and 
therefore unlawful.

 A. Successorship

 We will uphold the Board's findings of fact if they are 
supported by substantial evidence in the record as a whole. 
29 U.S.C. s 160(e); see Allentown Mack Sales & Serv., Inc. v. 
NLRB, 118 S. Ct. 818, 823 (1998). To that end we ask 
"whether on this record it would have been possible for a 
reasonable jury to reach the Board's conclusion." Allentown 
Mack, 118 S. Ct. at 823. As is apparent, this is a highly 
deferential standard of review. We give the Board even 
greater deference with respect to questions of fact that turn 
upon motive--in this case whether Capital's refusal to hire 
Ogden's employees was based upon anti-union animus. See 
Laro Maintenance Corp. v. NLRB, 56 F.3d 224, 229 (D.C. 
Cir. 1995). Finally, "[t]he Court must uphold Board-
approved credibility determinations of an ALJ unless they 
are 'hopelessly incredible' or 'self-contradictory,' " Elastic 
Stop Nut Div. of Harvard Indus., Inc. v. NLRB, 921 F.2d 
1275, 1281 (D.C. Cir. 1990), or "patently insupportable," Exx-
el/Atmos, Inc. v. NLRB, 28 F.3d 1243, 1246 (D.C. Cir. 1994).


 Under s 8(a)(1) of the Act it is an unfair labor practice for 
an employer "to interfere with, restrain, or coerce employees" 
in the exercise of their rights to organize, form, join, or assist 
a labor organization, and through it to bargain collectively. 
Section 8(a)(3) makes it an unfair labor practice for an 
employer "by discrimination in regard to hire or tenure of 
employment or any term or condition of employment to 
encourage or discourage membership in any labor organiza-
tion." Under s 8(a)(5) it is an unfair labor practice for an 
employer "to refuse to bargain collectively with the represen-
tatives of his employees."

 When one employer buys out another or by competitive 
bidding displaces it, the new employer is under a duty to 
bargain with the union with which its predecessor bargained 
if (1) the new employer does not make a "significant change" 
in the "essential nature" of the business, and (2) "a majority 
of the new [employer's] employees were employed by the 
predecessor." Elastic Stop Nut, 921 F.2d at 1281; see Fall 
River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 41 
(1987). Thus, the obligations of successorship depend upon 
whether "there is 'substantial continuity' between the new 
and predecessor employers." Harter Tomato Prods. Co. v. 
NLRB, 133 F.3d 934, 937 (D.C. Cir. 1998) (quoting Fall 
River, 482 U.S. at 43). Although a new employer is not 
required to hire the employees of its predecessor, see Howard 
Johnson Co. v. Detroit Local Joint Executive Bd., 417 U.S. 
249, 261 (1974), the new employer may not lawfully refuse to 
hire them because of their union affiliation, see Fall River, 
482 U.S. at 40; Burns, 406 U.S. at 280 n.5. In determining 
whether a new employer that did not hire its predecessor's 
union employees discriminated on the basis of their union 
membership, the Board looks to whether the employer was 
motivated by anti-union animus. Elastic Stop Nut, 921 F.2d 
at 1280. If so, then the new employer cannot escape its 
obligation to bargain with the union on the ground that the 
union does not represent a majority of its employees. Id. at 
1282.

 If the Board concludes that the new employer refused to 
hire the employees of its predecessor based upon anti-union 


animus, then the new employer may show as an affirmative 
defense that "it would have taken the [same] action regard-
less of the existence of such animus." Id. at 1280; see NLRB 
v. Transportation Management Corp., 462 U.S. 393, 440-43 
(1983); Laro Maintenance, 56 F.3d at 228; Wright Line, 251 
N.L.R.B. 1083, 1089 (1980), enf'd, 662 F.2d 899 (1st Cir. 1981). 
In other words, "a legitimate business purpose may provide a 
defense even in the face of anti-union animus." Elastic Stop 
Nut, 921 F.2d at 1280.

 Capital essentially concedes that it did not make any 
"significant change" in the "essential nature" of the business 
conducted by Ogden. Instead, Capital argues that it is not a 
"successor" to Ogden because it acted lawfully in not hiring a 
majority of its employees from among Ogden's workforce. In 
particular Capital contends that there is not substantial evi-
dence for the ALJ's finding that it refused to hire the Ogden 
employees because of anti-union animus.

 We hold that substantial evidence does support the ALJ's 
finding that Capital refused to hire 17 of the 19 Ogden 
employees because of their union membership. The evidence 
shows that Dennis Kaplan (whose denial the ALJ discredited) 
informed several of the Ogden employees that he did not 
want to hire union members. These employees in turn told 
their co-workers about Kaplan's statements. The ALJ could 
infer from this evidence that even the employees who did not 
talk to Kaplan decided not to apply because of Kaplan's anti-
union statements. See, e.g., NLRB v. Staten Island Hotel 
Ltd. Partnership, 101 F.3d 858, 861 (2d Cir. 1996) (upholding 
finding of anti-union animus from statements such as manag-
er "wasn't going to hire anybody from the union").

 Capital mounts four attacks upon this conclusion, none of 
which is persuasive. First, Capital asserts that the ALJ 
improperly discredited Dennis Kaplan's testimony denying 
that he told the Ogden employees he was not hiring union 
members. The ALJ rejected Dennis Kaplan's testimony on 
the grounds that it is internally inconsistent and that he 
attempted to signal an answer to Al Kaplan when the latter 
was testifying. As to the inconsistency, Dennis Kaplan testi-


fied, on the one hand, that in order to ensure a "smooth 
transition" he would have hired all of the Ogden employees if 
they had passed the screening and if building management 
had approved and, on the other hand, that he thought the 
Union's unconditional blanket application was "a little rough." 
As the ALJ found, these statements are in some tension; in 
these circumstances it is not our role to draw from the 
evidence inferences different from those the ALJ drew. See 
Caterair Int'l v. NLRB, 22 F.3d 1114, 1120 (D.C. Cir. 1994). 
As for the ALJ's reliance upon Dennis Kaplan's attempt to 
signal an answer to Al Kaplan during the latter's testimony, 
Capital does not deny the attempt but contends only that Al 
did not see Dennis signal and that Al's testimony was itself 
consistent. Neither point is even relevant: The ALJ could 
properly draw a negative inference regarding Dennis Kap-
lan's credibility based upon his attempt to influence the 
testimony of another witness during the hearing regardless 
whether that attempt succeeded.

 Second, Capital disputes the accuracy of Spataro's testimo-
ny that he met with the Ogden employees, gave them Capi-
tal's telephone number, and told them to apply for a job. 
Although there are inconsistencies in the testimony, several 
Ogden employees indicated generally that such a meeting 
occurred. In any event, the Spataro meeting is not, contrary 
to Capital's claim, the "cornerstone" of the General Counsel's 
case, nor even a necessary factual predicate for the ALJ's 
determination that Capital refused to hire the Ogden employ-
ees because of anti-union animus. There is no dispute that at 
least some of the Ogden employees called Capital to inquire 
about a job: Dennis Kaplan so testified and the notice Capital 
mailed to the employees stated that "a number of you have 
called our office." The relevant issue is whether Dennis 
Kaplan told the employees who called that he was not hiring 
union members--not, as Capital would have it, whether a 
union representative or someone else told the employees to 
apply.

 Third, Capital contends that this court should itself discred-
it the testimony of the Ogden employees to the effect that 
Kaplan made anti-union statements. Capital here refers to 


certain inconsistencies and minor contradictions in the testi-
mony of the employees upon matters other than the relevant 
question--that is, whether Kaplan made the anti-union state-
ments. The ALJ specifically credited the employees' testimo-
ny upon this issue. The problems to which Capital points do 
not, even in the aggregate, rise to a level that would cast 
doubt upon the ALJ's decision to credit the relevant testimo-
ny. In addition, the ALJ specifically credited the testimony 
of two of the employees based upon their "demeanor" and 
apparent "truthful[ness]," and we cannot say that their testi-
mony is "hopelessly incredible." Elastic Stop Nut, 921 F.2d 
at 1281 (upholding ALJ's decision to credit testimony of 
witness claiming he was told to limit the hiring of union 
members).

 Fourth, Capital suggests that we should discredit the Og-
den employees' testimony about Dennis Kaplan's anti-union 
statements because several of those employees required a 
translator for their testimony. Be that as it may, several 
witnesses testified in English when recounting their tele-
phone conversations with Kaplan. Indeed, all the most 
damning witnesses--those who testified most clearly that 
Kaplan said he was not hiring union members (Moore, Gallar-
do, and Mercado)--testified in English about their conversa-
tions with Kaplan.

 Notwithstanding this substantial evidence that Kaplan told 
the Ogden employees that he would not hire union members, 
Capital argues that it is not a successor because it did not 
hire a majority (or indeed, any) of Ogden's employees. Capi-
tal contends that it did not (and could not) hire any Ogden 
employees because they simply did not apply, and that they 
did not apply because they were not satisfied with the terms 
Capital offered. Although several of the Ogden employees 
did testify that they were not happy with the terms offered 
by Capital, only two of them (Reinoso and Rojas) gave either 
the low wage or lack of benefits offered by Capital as the sole 
reason they did not apply, and the ALJ properly excluded 
those two from relief under the order. More important, 
several of the employees testified expressly that they did not 
apply because of Kaplan's statements. And as noted above, 


those employees told their co-workers what Kaplan had said, 
making it a fair inference for the ALJ that the other employ-
ees did not apply for the same reason. In short, we agree 
with the Sixth Circuit that "where an employer makes known 
to prospective employees his refusal to hire them because of 
union affiliation, their failure to apply is no defense." Ameri-
can Press, Inc. v. NLRB, 833 F.2d 621, 627 (1987).

 Capital's final argument is that regardless whether it acted 
with anti-union animus to discourage Ogden's employees from 
applying for jobs, it would lawfully have refused to hire most 
of them if they had applied. Capital contends that it would 
not have hired a majority of union employees because the 
building management had expressed dissatisfaction with Og-
den's performance. There was no testimony, however, that 
the building management had singled out any individual 
employees. Therefore, Capital has failed utterly to show that 
it would not have hired a majority of its employees from 
among Ogden's workers absent its anti-union animus.

 In sum, Capital was a successor to Ogden. It violated 
ss 8(a)(1) and (3) by refusing to hire the Ogden employees 
because of their union membership, and it violated ss 8(a)(1) 
and (5) by refusing to recognize and bargain with the union.

 B. Setting the Initial Terms

 Capital argues that even if it did engage in anti-union 
discrimination it did not violate ss 8(a)(1) and (5) of the Act 
by unilaterally--that is, without first bargaining with the 
Union--setting the initial terms and conditions under which it 
would hire the Ogden employees. Citing NLRB v. Burns 
International Security Services, Inc., 406 U.S. 272 (1972), 
Capital argues that it was entitled to set the initial terms and 
conditions upon which it would offer employment when it won 
the bid for the Bulova office building. In Burns the employer 
hired a majority of its employees from among the employees 
of its predecessor but refused to bargain with their union. 
Id. at 275-76. The Board held that the employer had violated 
s 8(a)(5) and as a remedy imposed upon it the CBA that had 
been signed by its predecessor. Although the Supreme 
Court agreed with the Board that Burns had a duty to 

bargain with the union representing the employees of its 
predecessor, id. at 277-81, it did not agree with the Board's 
choice of a remedy. As the Court stated:

 It does not follow ... from Burns' duty to bargain that it 
 was bound to observe the substantive terms of the 
 collective-bargaining contract the union had negotiated 
 with [the predecessor] and to which Burns had in no way 
 agreed.

Id. at 281-82. The Court explained:

 Although a successor employer is ordinarily free to set 
 initial terms on which it will hire the employees of a 
 predecessor, there will be instances in which it is perfect-
 ly clear that the new employer plans to retain all of the 
 employees in the unit and in which it will be appropriate 
 to have him initially consult with the employees' bargain-
 ing representative before he fixes terms. In other situa-
 tions, however, it may not be clear until the successor 
 employer has hired his full complement of employees 
 that he has a duty to bargain with a union, since it will 
 not be evident until then that the bargaining representa-
 tive represents a majority of the employees in the unit as 
 required by s 9(a) of the Act, 29 U.S.C. s 159(a).

Id. at 294-95.

 Thus, the general rule of Burns and its progeny is that a 
successor employer is, like any non-union employer, free to 
set the initial terms upon which it offers employment. In the 
ordinary case the successor's obligation to bargain with the 
union accrues only when it has hired a "substantial and 
representative complement" of its work force, Fall River, 482 
U.S. at 47, 52 (clarifying timing of bargaining obligation), and 
a majority of those employees were employed by its predeces-
sor. If it is "perfectly clear" ex ante, however, that the 
successor employer "plans to retain all of the employees in 
the unit," then Burns requires the successor to bargain with 
the union even before setting the initial terms of employment. 
Burns, 406 U.S. at 294-95. This has come to be known as the 
"perfectly clear" exception to Burns.


 In Burns the Court did not address a situation where the 
successor, based upon anti-union animus, unlawfully refused 
to hire the employees of its predecessor. For cases involving 
such discrimination the Board has adopted what it calls in its 
brief a "corollary" to the perfectly clear exception: If the 
successor employer refuses to hire its predecessor's employ-
ees because of anti-union discrimination, then the Board 
presumes that but for the unlawful discrimination the new 
employer would have hired all or substantially all of those 
employees when it first started hiring. The Board's rationale 
for this presumption is that when a new employer discrimi-
nates against union adherents the remedy is to instate or 
reinstate them; assuming therefore that they had been em-
ployed all along, it is reasonable further to assume that a 
majority of the employees are in favor of the union. It 
follows that the employer had an obligation from the outset to 
bargain with the union. See, e.g., Kallmann v. NLRB, 640 
F.2d 1094, 1100-01 (9th Cir. 1981).

 In effect, when a successor refuses to hire its predecessor's 
employees based upon anti-union animus, the successor loses 
the right unilaterally to set the initial terms and conditions of 
employment; it must first bargain with the union. In uphold-
ing the Board in this respect we join every other court to 
have considered the issue. See, e.g., Pace Indus., Inc. v. 
NLRB, 118 F.3d 585, 593-94 (8th Cir. 1997); U.S. Marine 
Corp. v. NLRB, 944 F.2d 1305, 1320 (7th Cir. 1991) (en banc); 
American Press, Inc. v. NLRB, 833 F.2d 621, 624-25 (6th Cir. 
1987); Shortway Suburban Lines, Inc., 286 N.L.R.B. 323, 328 
(1987), enf'd mem., 862 F.2d 309 (3d Cir. 1988); Potter's Drug 
Enterprises, Inc., 233 N.L.R.B. 15, 20 (1977), enf'd mem., 584 
F.2d 980 (9th Cir. 1978); see also Karl Kallmann d/b/a Love's 
Barbeque Restaurant No. 62, 245 N.L.R.B. 78, 82 (1979) 
(applying perfectly clear exception because of uncertainty 
caused by failure to hire union members due to anti-union 
animus), enf'd in relevant part, 640 F.2d 1094 (9th Cir. 1981).

 We conclude that the Board was correct in holding that 
Capital violated ss 8(a)(1) and (5) of the Act by setting its 
initial terms and conditions of employment without first bar-


gaining with Local 32. Having earlier determined (in Part 
II.A) that Capital was a successor employer to Ogden, we 
now hold that because Capital refused to hire the Ogden 
employees based upon their union membership, the Board 
properly presumed that but for such discrimination Capital 
would have hired a majority of the Ogden employees from the 
outset. Accordingly, Capital had a duty to bargain with 
Local 32 and therefore did not have the right unilaterally to 
set the terms and conditions upon which it offered employ-
ment.

 Capital raises two arguments to the contrary but they are 
both misconceived. First, Capital asserts that the Board's 
corollary to the perfectly clear exception is inconsistent with 
Burns. In Burns, however, the successor did not violate the 
Act by unlawfully refusing to hire a majority of union employ-
ees. On the contrary, the successor did, in fact, hire them; 
its dereliction was in failing to bargain with their union. For 
that unfair labor practice the proper remedy was a bargaining 
order. In a case like this, however, where Capital's anti-
union discrimination makes it difficult to determine how many 
of its predecessor's employees it would have hired if it had 
not unlawfully discriminated against union adherents, it is 
only reasonable for the Board to presume that the successor 
would have hired a majority of union members and therefore 
had an obligation from the outset to bargain with the union 
rather than unilaterally setting the terms of employment. 
Therefore, the Board's reasoning is consistent with the per-
fectly clear exception in Burns. The other cases upon which 
Capital relies, Spruce Up Corp., 209 N.L.R.B. 194 (1974) 
(interpreting the perfectly clear exception), enf'd mem. sub 
nom. Stone and Webster Engineering Corp. v. NLRB, 510 
F.2d 966 (4th Cir. 1975), and International Association of 
Machinists and Aerospace Workers v. NLRB, 595 F.2d 664 
(D.C. Cir. 1978) (approving the Board's reasoning in Spruce 
Up), are inapposite because the successor employers there 
did not discriminate against union adherents.

 Second, Capital asserts that its case is unique because it 
expressly offered employment to its predecessor's unionized 
employees. That is true in form but not in substance, for as 


we have seen Capital actively discouraged the Ogden employ-
ees from applying by telling them that it was not hiring union 
members.

 In sum, because Capital refused to hire the Ogden employ-
ees based upon anti-union animus, the Board properly pre-
sumed that absent discrimination Capital would have hired a 
majority of union members, and therefore had a duty to 
bargain with the Union. The Board also correctly held that 
by refusing to hire union members, Capital lost its right to 
set the initial terms and conditions of employment, and hence 
violated ss 8(a)(1) and (5), when it nonetheless set wages and 
working conditions without first bargaining with the union.

 C. The Remedy

 Capital's final argument is that the Board's remedy for its 
violations--requiring it "to restore retroactively [the] preex-
isting terms and conditions of employment" set forth in the 
CBA between Ogden and Local 32--is unlawful because it is a 
penalty. We agree.

 Preliminarily the Board contends that Capital waived this 
argument by failing to raise it with sufficient specificity 
before the Board. See 29 U.S.C. s 160(e); 29 C.F.R. 
s 102.46(b)(1). Capital told the Board in its exceptions to the 
decision of the ALJ that it objected "to the entire Remedy 
... because ... there were no violations of the Act." That 
broadside is sufficient in the circumstances of this case, 
however, under the Board's regulation providing:

 If a supporting brief is filed the exceptions document 
 shall not contain any argument or citation of authority in 
 support of the exceptions, but such matters shall be set 
 forth only in the brief.

29 C.F.R. s 102.46(b)(1). Capital clearly did make the pres-
ent argument in its brief to the Board when it stated (among 
other things) that

 ordering Capital to institute the terms in effect under the 
 Ogden-Local 32 collective bargaining agreement would 
 not only be violative of Burns, but it would also be an 

 unlawful, punitive order at odds with the purposes of the 
 Act.

 We think Capital complied with its obligations under both 
the statute and the regulation when it alerted the Board in its 
exceptions that it objected to the remedy and then stated its 
specific reasoning in its brief to the Board. Certainly the 
Board cannot contend that it lacked notice that Capital was 
making this argument. See Consolidated Freightways v. 
NLRB, 669 F.2d 790, 794 (D.C. Cir. 1981) ("[T]he critical 
inquiry is whether the objections made before the Board were 
adequate to put the Board on notice that the issue might be 
pursued on appeal"). Accordingly, we hold that Capital did 
not waive its objection to the Board's remedy.

 As to the merits, we hold that the Board's remedy is 
punitive and therefore unlawful. Section 10(c) of the Act 
states that the Board may issue

 an order requiring [a person who committed an unfair 
 labor practice] to cease and desist from such unfair labor 
 practice, and to take such affirmative action including 
 reinstatement of employees with or without back pay, as 
 will effectuate the policies of [the Act].

29 U.S.C. s 160(c). The Supreme Court has more than once 
indicated that the goal of the remedy is "to restore the 
situation 'as nearly as possible, to that which would have 
obtained but for the illegal discrimination.' " Sure-Tan, Inc. 
v. NLRB, 467 U.S. 883, 900 (1984) (quoting Phelps Dodge 
Corp. v. NLRB, 313 U.S. 177, 194 (1941)). That is, the 
Board's remedy must be truly remedial and not punitive. See 
NLRB v. Strong, 393 U.S. 357, 359 (1969); Republic Steel 
Corp. v. NLRB, 311 U.S. 7, 10-12 (1940); Grondorf, Field, 
Black & Co. v. NLRB, 107 F.3d 882, 888 (D.C. Cir. 1997). 
More particularly, the Court has stated that "a backpay 
remedy must be sufficiently tailored to expunge only the 
actual, and not merely speculative, consequences of the un-
fair labor practices." Sure-Tan, Inc., 467 U.S. at 900 (em-
phases in original). Therefore, although a reviewing court 
must give special respect to the Board's choice of remedy, 


NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n.32 (1969), 
we must also be mindful

 not [to] function simply as the Board's enforcement arm. 
 It is our responsibility to examine carefully both the 
 Board's findings and its reasoning, to assure that the 
 Board has considered the factors which are relevant to 
 its choice of remedy, selected a course which is remedial 
 rather than punitive, and chosen a remedy which can 
 fairly be said to effectuate the purposes of the Act.

Peoples Gas Sys., Inc. v. NLRB, 629 F.2d 35, 42 (D.C. Cir. 
1980).

 As we have seen (in Part II.B.1) the Board properly 
concluded that Capital violated ss 8(a)(1) and (5) of the Act 
by setting the initial terms of employment without first 
bargaining with Local 32. As part of the remedy for this 
violation the Board ordered Capital

 to restore retroactively preexisting terms and conditions 
 of employment, including wage rates and benefit plans, 
 and make the employees whole by remitting all wages 
 and benefits that would have been paid absent such 
 unilateral changes from May 2, 1992, until [Capital] 
 negotiates in good faith with Local 32B-32J or to im-
 passe.

The Board's rationale for this type of remedy appears in its 
opinion in State Distributing Company:

 [I]t is appropriate to calculate backpay on the basis of 
 the contractual rates paid by the predecessor (in other 
 words, the existing terms and conditions of employment) 
 because the successor's unlawful failure to recognize and 
 bargain with the union has left us without an adequate or 
 reasonable alternative basis for calculating what rates 
 would have been arrived at through lawful bargaining. 
 As noted above in connection with the uncertainties 
 regarding hiring, it is proper to resolve uncertainties 
 against the one whose unlawful acts have created those 
 uncertainties.

 * * *

 The remedy the Board has chosen has the drawback of 
 retroactively imposing on the [successor employer] terms 
 and conditions of employment that had been set by the 
 contract negotiated by its predecessor, but it has the 
 advantage of giving some recompense to the victims of 
 the discrimination and preventing the [successor employ-
 er] from enjoying a financial position that is quite possi-
 bly more advantageous than the one it would occupy had 
 it behaved lawfully. A remedy that allowed to stand the 
 reduced terms and conditions of employment that the 
 [successor employer] imposed unilaterally would give full 
 effect to the right of a Burns successor to set its own 
 terms, but this would quite possibly leave victims uncom-
 pensated and it would confer Burns rights on an employ-
 er that has not conducted itself like a lawful Burns 
 successor because it has unlawfully blocked the process 
 by which the obligations and rights of such a successor 
 are incurred. A remedy such as the court suggested in 
 [Kallmann v. NLRB, 640 F.2d 1094, 1103 (9th Cir. 1981) 
 (holding that "an appropriate back pay remedy cannot 
 require Kallmann to pay the higher rate [in the prede-
 cessor's CBA] beyond a period allowing for a reasonable 
 time of bargaining" because "Kallmann would not have 
 agreed to union demands to pay the higher rate")] ... is 
 virtually impossible to calculate, and to the extent that it 
 involves imposing contractual terms based on this Agen-
 cy's conjecture without an adequate factual basis, it 
 seems hardly preferable to imposing on the [successor 
 employer] the terms under which the [predecessor's] 
 employees had worked just before the [successor employ-
 er] took over the enterprise.

282 N.L.R.B. 1048, 1049 (1987).

 We disagree with the Board's reasoning and conclude that 
requiring Capital to reimburse the Ogden employees at the 
rate set by the CBA between Ogden and Local 32 for the 
entire period from the violation (May 2, 1992) until such 
future time as Capital reaches a new agreement or an im-
passe with Local 32 is punitive rather than remedial. Prelim-
inarily, we reject the Board's implicit assumption that, if 


Capital had not violated ss 8(a)(1) and (5) by unilaterally 
setting the initial terms of employment, then it would have 
agreed to the CBA into which its predecessor had entered. 
Neither the "perfectly clear" exception in Burns nor the 
Board's corollary thereto for cases (such as this) in which the 
successor discriminates against union adherents requires that 
the successor agree to the terms of the CBA between the 
predecessor and the union; nor could they. See H.K. Porter 
Co. v. NLRB, 397 U.S. 99, 102 (1970) (Board does not have 
"power to compel a company ... to agree to any substantive 
contractual provision" in a CBA). By engaging in anti-union 
discrimination the successor loses only the right to set initial 
terms without first bargaining with the union; it does not lose 
the right to take an initial bargaining position with the union 
and to bargain hard from that point. See 29 U.S.C. s 158(d) 
(the obligation to bargain "does not compel either party to 
agree to a proposal or require the making of a concession"). 
As the Ninth Circuit held in Kallmann:

 Even though under the facts of this case [the successor 
 employer] had a duty to consult with the union before 
 unilaterally changing the terms of employment, as a 
 successor employer he had no obligation to accept his 
 predecessor's labor agreement.

640 F.2d at 1103; see also Burns, 406 U.S. at 284 ("[A]l-
though successor employers may be bound to recognize and 
bargain with the union, they are not bound by the substantive 
provisions of a [CBA] negotiated by their predecessors but 
not agreed to or assumed by them"); New Breed Leasing 
Corp. v. NLRB, 111 F.3d 1460, 1470 (9th Cir. 1997) (O'Scann-
lain, J., dissenting) ("The [perfectly clear] exception only 
imposes a duty on the successor to 'consult' with the union 
before it sets the initial terms and conditions of employment. 
The duty to consult however does not imply an obligation to 
accept the old terms of employment"); U.S. Marine Corp., 
944 F.2d at 1329 (Easterbrook, J., dissenting) (same).

 We conclude that in order to approximate what would have 
occurred but for Capital's violation of the Act, and thus to 
avoid penalizing Capital, the Board should have imposed upon 


Capital the terms of the prior CBA only for "a period 
allowing for a reasonable time of bargaining." Kallmann, 
640 F.2d at 1103. After a reasonable period of bargaining the 
parties would either have negotiated a new wage rate or 
reached impasse. No one can know with certainty what wage 
Capital would have agreed to but the best evidence of the 
wage it would have had to pay in order to get labor is the rate 
it (through its subcontractor) actually paid the new employees 
who did the work previously done by the Ogden employees. 
A remedy based upon the wage actually paid makes more 
sense than a remedy based upon the prior CBA wage because 
there is no reason to believe that Capital would have agreed 
to paying any more than it had to for labor; the Board's 
alternative presumption that Capital would have agreed gra-
tuitously to pay the higher CBA rate is unreasonable and, as 
a result, punitive. Cf. U.S. Marine Corp., 944 F.2d at 1330 
(Easterbrook, J., dissenting) ("The Board's rationale is unre-
lated to the anticipated (or actual) outcome of bargaining"). 
If the Board nonetheless believes that, owing to some special 
circumstances, Capital in fact would have agreed in negotia-
tions with the Union to pay a higher rate than it had to pay 
for alternative labor, then the Board may, of course, put on 
evidence to prove what the rate would have been.

 Contrary to the Board's claim in State Distributing, our 
understanding of the appropriate remedy does not give the 
wrongdoing employer the right to set initial terms of employ-
ment: the remedial wage is still initially--and for the reason-
able period during which the employer should have bargained 
with the union--the rate in its predecessor's CBA. We 
simply observe that in order realistically to approximate what 
would have happened absent discrimination the Board must 
take account of what actually did happen. Doing so focuses 
the Board's efforts upon the only proper remedial goal, 
namely, placing the employees in the situation they would 
have enjoyed but for Capital's having unlawfully refused to 
hire them.

 We recognize that our view of the limitation s 10(c) places 
upon the remedial authority of the Board in this type of case 
conflicts with that of several other circuits. See New Breed 


Leasing Corp. v. NLRB, 111 F.3d 1460, 1467-69 (9th Cir. 
1997); NLRB v. Staten Island Hotel Ltd. Partnership, 101 
F.3d 858, 861-62 (2d Cir. 1996); U.S. Marine Corp. v. NLRB, 
944 F.2d 1305, 1319-24 (7th Cir. 1991) (en banc); see also 
Pace Indus., Inc. v. NLRB, 118 F.3d 585, 593-94 (8th Cir. 
1997) (brief discussion); NLRB v. Horizons Hotel Corp., 49 
F.2d 795, 806 (1st Cir. 1995) (same); Systems Management, 
Inc. v. NLRB, 901 F.2d 297, 307-09 (3d Cir. 1990) (granting 
enforcement of remedial order but suggesting that Board 
might limit term of back-pay to time for bargaining to 
impasse). Other courts, however, have taken an approach 
similar to ours. See Armco, Inc. v. NLRB, 832 F.2d 357, 365 
(6th Cir. 1987); Kallmann v. NLRB, 640 F.2d 1094, 1103 (9th 
Cir. 1981); NLRB v. Dent, 534 F.2d 844, 846-47 (9th Cir. 
1976); see also New Breed Leasing, 111 F.3d at 1469-72 
(O'Scannlain, J., dissenting); U.S. Marine, 944 F.2d at 1327-
31 (Easterbrook, J., dissenting). As we see it, the alternative 
adopted by the Board conflicts with two cardinal principles of 
labor law: (1) an employer cannot be required to accept 
contractual terms to which it did not agree, and (2) the 
Board's remedial order must be just that--remedial--and not 
punitive.

 III. Conclusion

 We hold that (1) there is substantial evidence in the record 
supporting the Board's determination that Capital violated 
ss 8(a)(1) and (3) of the Act by refusing to hire the Ogden 
employees based upon their union membership; (2) as a 
successor employer, Capital violated ss 8(a)(1) and (5) of the 
Act by refusing to recognize and bargain with Local 32; and 
(3) Capital again violated ss 8(a)(1) and (5) by setting initial 
terms and conditions of employment before negotiating with 
Local 32. We also hold that (4) the Board's remedy--
imposing upon Capital the terms of its predecessor's CBA 
from the date of the violation until the conclusion of future 
negotiations--is punitive and therefore invalid. We therefore 
remand the case to the Board for further proceedings consis-
tent with this opinion.

So ordered.