**Sandra DUNBAR, Regional Director of the Third Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ONYX PRECISION SERVICES, INC., Respondent.**

No. 00–CV–686A.

United States District Court, W.D. New York.

Dec. 20, 2000.

Beth Mattimore, Robert Ringler, National Labor Relations Board, Buffalo, NY, for Sandra Dunbar, for and on behalf of the National Labor Relations Board, petitioners.

Allen B. Roberts, Roberts & Finger, New York, NY, for Onyx Precision Services, Inc., respondents.

## DECISION AND ORDER

ARCARA, District Judge.

### *INTRODUCTION*

On August 9, 2000, petitioner, the Regional Director of the Third Region of the National Labor Relations Board ("NLRB"), brought the instant action, pursuant to § 10(j) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 160(j), seeking injunctive relief pending

final disposition of a complaint currently before the NLRB, in which petitioner alleges that respondent; Onyx Precision Services, Inc. ("Onyx"), violated §§ 8(a)(1) and (5) of the NLRA, 29 U.S.C. §§ 158(a)(1) and (5), by failing to recognize and bargain with the certified collective bargaining representative of employees of a company which Onyx bought. Petitioner currently seeks a preliminary injunction enjoining Onyx from persisting in the course of conduct alleged to have violated the NLRA. Also appearing in this action are the International Union of Painters and Allied Trades, AFL–CIO, CLC ("Painters"), as a party-in-interest, and the Paper, Allied–Industrial, Chemical and Energy Workers International Union, AFL–CIO ("PACE"), as an *amicus curiae*.[1] A preliminary injunction hearing was held on November 14, 2000. After considering the evidence submitted at the hearing, reviewing the submissions of the parties, and hearing argument from counsel, the Court hereby grants petitioner's motion for a preliminary injunction. The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a) and 65(d).

### FINDINGS OF FACT

On December 14, 1995, the Oil, Chemical and Atomic Workers International Union ("OCAW") was certified by the NLRB as the exclusive collective bargaining representative of certain employees employed by C.H. Heist, Inc. ("Heist"), in the following collective bargaining unit (the "Unit"):

> All full-time and regular part-time employees engaged in high pressure water cleaning work, wet and dry vacuum cleaning work, and filter press watering system work who work out of the Employer's Niagara Falls facility, but excluding all office clerical employees, painters, professional employees, guards and supervisors as defined in the [NLRA], and all other employees.

OCAW and Heist then negotiated and executed a collective bargaining agreement covering the Unit which was effective by its terms from March 22, 1996 through April 30, 1999. On January 5, 1999, OCAW and the United Paperworkers International Union merged to form PACE, the successor of OCAW. PACE and Heist then negotiated a successor collective bargaining agreement covering the Unit, which was effective from May 1, 1999 through April 30, 2000. This contract memorialized PACE's status as a successor to OCAW.

Prior to March 13, 2000, Heist provided high pressure cleaning services to industrial and commercial clients. Its operations included facilities in Niagara Falls, New York (the "Niagara Falls Facility") and Buffalo, New York (the "Buffalo Facility"), as well as other locations throughout the United States. On March 13, 2000, Heist and Onyx entered into an asset purchase agreement, whereby Heist sold its industrial maintenance operations, including the Niagara Falls and Buffalo Facilities, to Onyx.

In anticipation of the April 30, 2000 expiration of the collective bargaining agreement between PACE and Heist, PACE representative James Briggs ("Briggs") set an appointment with Heist's Director of United States Operations, Duane Worthington ("Worthington"), to negotiate a successor contract on March 16, 2000, at the Niagara Falls Facility. On that date, however, Worthington informed Briggs that: (1) on March 13, 2000, Onyx purchased Heist's Niagara Falls and Buffalo Facilities; (2) Onyx intended to close the Niagara Falls Facility and transfer the Unit's work to the Buffalo Facility; and (3) Onyx would not recognize PACE as the collective bargaining representative of the Unit at either location. Briggs immediate-

---

**1.** PACE filed its motion to appear *amicus curiae* on August 17, 2000. That motion is hereby granted.

ly responded by demanding that Onyx recognize PACE as the exclusive collective bargaining representative of the Unit, and that Onyx bargain with PACE regarding the closing of the Niagara Falls Facility. Worthington agreed to meet with Briggs regarding these matters on March 20, 2000, but on that date, during a telephone call with Briggs, Worthington reaffirmed Onyx's initial stance that it would not recognize PACE's status as the collective bargaining representative of the Unit. By letter dated March 29, 2000, PACE's legal counsel again requested recognition and negotiation.

Immediately prior to Onyx's March 13, 2000 purchase of Heist, Heist employed fourteen Unit employees at the Niagara Falls Facility. Unit employees performed a variety of cleaning services for industrial and commercial clients. Although the majority of their work was based in western New York, they serviced clients throughout the United States and overnight travel was periodically required. Their work was exclusively performed at customer facilities, and actual visits to Heist's Niagara Falls Facility were infrequent. Unit employees generally telephoned the Niagara Falls Facility to receive their next day's work assignment. Heist's Buffalo Facility served as an administrative office and research and development facility. There is no evidence that the Buffalo Facility ever served as a dispatching center for the type of work performed by the Unit employees or that it played the same role as the Niagara Falls Facility during the time it was owned by Heist.

When Onyx took over Heist's Niagara Falls Facility on March 13, 2000, all working conditions, supervision, clientele serviced, work methodology and equipment, terms and conditions of employment, and work jurisdiction all remained unchanged. Onyx offered all Unit employees the same wages, hours and terms and conditions of employment that were offered by Heist. Onyx retained the Heist management team in their same capacities. All the Unit employees were initially retained by Onyx and continued working at the Niagara Falls Facility. No new employees were hired into the Unit.

On March 24, 2000, Onyx unilaterally laid off three of the fourteen Unit employees. On or about April 30, 2000, Onyx relocated its operations at the Niagara Falls Facility to the Buffalo Facility. Relocation essentially meant a change in the location of the dispatcher, vehicle storage area, the equipment and supply warehouse, and the site of infrequent employee meetings. All these functions were previously performed at the Niagara Falls Facility. However, as a result of the relocation, the actual location of Unit work remained unchanged and continued to be performed at various customer locations throughout the area. Although Onyx changed the Unit employees' health insurance coverage, meal allowance monies, 401(k) retirement plan, and dues deductions after the relocation, there is no evidence that any other terms and conditions of employment, working conditions, supervision, customers, work methodology, or jurisdiction changed due to the relocation.

On March 13, 2000, the date of the sale of the Heist facilities to Onyx, Heist executed a collective bargaining agreement with the Painters, which was to run from March 13, 2000 through March 13, 2003 (the "Painters Contract"). The Painters Contract covers, by its terms, a bargaining unit of employees employed by Onyx at the Buffalo Facility ("Painters Unit"). The Painters Unit would appear to encompass the same classification as the Unit. Onyx began applying the Painters Contract to the Unit employees after their transfer to the Buffalo Facility on April 30, 2000.

Petitioner contends, and the Court agrees, that the Painters Contract is nothing more than a sham contract. The Painters was never chosen by employees at the Buffalo Facility to represent them. In fact, it is not clear what employees, if

any, were working at the Buffalo Facility on March 13, 2000. There is every indication that Heist entered into the collective bargaining agreement with the Painters knowing that it was going to sell the company to Onyx. The only plausible explanation for such action is that Onyx preferred to deal with the Painters rather than PACE, and arranged with Heist to enter into the sham Painters Contract in order to force the Unit employees from PACE and into the Painters.

## CONCLUSIONS OF LAW

The NLRA empowers the NLRB, "upon issuance of a complaint ... charging that any person has engaged in or is engaging in an unlawful labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred ... for appropriate temporary relief or restraining order." 29 U.S.C. § 160(j). "To warrant the granting of relief under this section, the district court must find: (1) reasonable cause to believe that an unfair labor practice has occurred; and (2) that [granting] injunctive relief would be just and proper." *See Silverman v. J.R.L. Food Corp.*, 196 F.3d 334, 335 (2nd Cir. 1999) (internal quotations and citations omitted).

### A. *Reasonable Cause*

■ In determining whether there is reasonable cause to believe that an unfair labor practice has occurred, the district court owes a degree of deference to the NLRB.

> The court need not make a final determination that the conduct in question is an unfair labor practice. It need find only reasonable cause to support such a conclusion. Appropriate deference must be shown to the judgment of the NLRB, and a district court should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed.

*Silverman v. Major League Baseball Player Relations Comm.*, 67 F.3d 1054, 1059 (2d Cir.1995) (citations omitted). The district court may not resolve contested factual issues, but instead must give the NLRB's version of the facts the benefit of the doubt. *Seeler v. Trading Port, Inc.*, 517 F.2d 33, 36–37 (2d Cir.1975). Thus, the district court may not resolve issues of witness credibility. *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1051–52 n. 5 (2d Cir.1980).

Applying the above principles to the instant case, the Court finds that petitioner has established reasonable cause to believe that Onyx committed an unfair labor practice by refusing to recognize and bargain with PACE, as the exclusive certified bargaining representative of the Unit, by unilaterally changing terms and conditions of employment, by unilaterally laying off three Unit employees, and by refusing to bargain with PACE about the effects of the relocation of the Unit from Niagara Falls to Buffalo.

### 1. *Onyx is a Successor and Obligated to Recognize and Bargain with PACE*

■ Petitioner argues, and the Court finds for purposes of the preliminary injunction motion, that Onyx is a successor to Heist, and thus obligated to recognize and bargain, upon request, with PACE. An employer who takes over another's operations is required to bargain with a union representing the predecessor's employees when (1) there is a "substantial continuity" of operations after the takeover; and (2) if a majority of the new employer's workforce, in an appropriate unit, consists of the predecessor's employees at a time when the successor has reached a "substantial and representative complement." *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 43–47, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987); *NLRB v. Burns Int'l Security Servs., Inc.*, 406 U.S. 272, 280–81, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). Several factors define "substantial continuity" of operations:

Whether the business ... is essentially the same; whether the employees ... are doing the same jobs in the same working conditions under the same supervisors; and whether the new entity has the same production process, produces the same products and has basically the same body of customers.

*Fall River Dyeing*, 482 U.S. at 43, 107 S.Ct. 2225 (citations omitted). "Substantial continuity" of operations is viewed from an employee's perspective. *Id.* at 43–44, 107 S.Ct. 2225.

### a. Substantial Continuity

■ From March 13 to April 30, 2000, Onyx's operations at the Niagara Falls Facility, as they pertain to the Unit, were a substantial continuation of the Heist enterprise. Working conditions, supervision, clientele, work methodology, equipment, terms and conditions of employment, and jurisdiction all remain unchanged after Onyx took over operations at the Niagara Falls Facility on March 13, 2000. Onyx's continued operations at the Niagara Falls Facility satisfied every element of the *Fall River Dyeing* "substantial continuity" test. When Onyx's continuation of operations at the Niagara Falls Facility is viewed through the eyes of the Unit employees, these employees had every reason to believe that the operation, their role in the operation, and PACE's potential role to bargain for changes on their behalf was the same.

Onyx's relocation of its Niagara Falls Facility operations to the Buffalo Facility on April 30, 2000, does not defeat a finding of "substantial continuity." This relocation solely translated into changes in the locale where infrequent Unit meetings were held, the place where employees telephoned Onyx for assignments, and the site that vehicles, equipment and supplies were warehoused. Such changes were minor, when viewed through the eyes of the Unit employees. The major facets of the Unit's workplace, such as the actual location of their work, working conditions, supervi-

sion, customers, work methodology or jurisdiction remain unchanged. Accordingly, Onyx's operation at the Buffalo Facility still meets the "substantial continuity" test set forth in *Fall River Dyeing*.

### b. Substantial and Representative Complement

Onyx hired a substantial and representative complement of the Unit employees. On March 13, 2000, Onyx hired all the employees in the Unit at Heist's Niagara Falls Facility and did not hire any new employees. It appears undisputed that the Unit is an appropriate collective bargaining unit within the meaning of the NLRA. The NLRB certified Heist's Niagara Falls Facility Unit on December 14, 1995. Since certification, the Unit has not undergone any significant changes in the character of its work. When Onyx moved to Buffalo in late April 2000, a majority of its employees were previously Unit members at Heist.

### 2. Accretion Argument

■ Onyx argues that its transfer of the Unit work to the Buffalo Facility resulted in accretion of the Unit employees into the Painters Unit at the Buffalo Facility, and thus relieved Onyx of its obligation to recognize PACE as the collective bargaining representative of the Unit. In other words, Onyx argues that it properly recognized the Painters as the exclusive collective bargaining representative of the employees performing Unit work at the Buffalo Facility, and applied the Painters Contract accordingly. The Court finds this argument without merit for two reasons.

First, NLRB precedent rejects accretion where the accreted employees form a majority of the larger Unit. *See, e.g., Martin Marietta Co.*, 270 NLRB 821, 822 (1984). Here, the accreted Unit employees not only formed a majority of the Painters Unit at the Buffalo Facility, but actually formed the entire Painters Unit.

Second, and perhaps more importantly, as stated above, the evidence shows that

the Painters Contract was just a sham contract entered into by Heist (on behalf of Onyx) and the Painters so that Onyx could avoid having to deal with PACE. It is apparent that, for some reason, Onyx did not want to deal with PACE, but preferred instead to deal with the Painters. No employees of the Buffalo Facility ever voted to be represented by the Painters and therefore the Painters Contract was invalid. Accordingly, any affirmative defense by Onyx based on the Painters Contract is without merit.

### 3. PACE's Demand for Recognition and Bargaining

Onyx argues that PACE failed to request recognition and bargaining at the Buffalo Facility and, as a result, Onyx was excused from recognizing and bargaining with PACE at the Buffalo Facility. The Court finds this argument without merit.

■ Under the "continuing demand" rule, a union need not continuously renew its recognition demand to a successor. *See Fall River Dyeing*, 482 U.S. at 52–53, 107 S.Ct. 2225. Here, even though one demand to bargain would have sufficed, PACE made three separate demands, on March 16, 2000, March 17, 2000 and March 29, 2000. To date, Onyx has refused to recognize and bargain with PACE.

### 4. Onyx's Forfeiture of the Right to Set Initial Terms and Conditions

■ When Onyx employed a majority of its work force from Heist's former employees and carried on Heist's business essentially unchanged, Onyx became a successor employer to Heist. A successor is obligated to recognize and bargain with the representative of its predecessor's former employees. *See Burns*, 406 U.S. at 280–81, 92 S.Ct. 1571. Ordinarily, however, a successor is not bound by its predecessor's collective bargaining agreement and is free to set the initial terms of employment for its workers without first consulting with their union. *Id.* at 294–95, 92 S.Ct. 1571. Nevertheless, a successor

employer forfeits its right under *Burns* to set initial terms and conditions of employment when, from the outset, it makes clear that it will not fulfill its corresponding *Burns'* obligations. *See NLRB v. Advanced Stretchforming, Int'l, Inc.*, 233 F.3d 1176, 1180 (9th Cir.2000).

> The fundamental premise for the forfeiture doctrine is that it would be contrary to statutory policy to confer *Burns* rights on an employer that has not conducted itself like a lawful *Burns* successor because it has unlawfully blocked the process by which the obligations and rights of such a successor are incurred ... In other words, the *Burns* right to set initial terms and conditions of employment must be understood in the context of a successor employer that will recognize the affected unit employees' collective bargaining representative and enter into good faith negotiations with that union about those terms and conditions.

*Id.* (citation omitted).

In this case, Onyx announced its intention to abandon its *Burns'* obligations on March 16, 2000, when it refused to recognize PACE as the collective bargaining representative of the Unit. Onyx continued to demonstrate its unlawful intent when it failed to respond to PACE's multiple recognition requests.

■ Moreover, even if Onyx, as a successor, could set initial Unit terms and conditions of employment, its failure to set such initial terms on March 13, 2000, the first day of its takeover, resulted in the establishment of the then existing terms. *See Banknote Corp. of N. Am. v. NLRB*, 84 F.3d 637, 647 n. 5 (2d Cir.1996). When Onyx first took over, it failed to change any of the Unit's terms and conditions of employment. As a result, Onyx could not make subsequent unilateral changes without notice to and bargaining with PACE.

■ Onyx also forfeited its right to set initial terms and conditions of employment

under the so-called "perfectly clear" exception. Under this exception, a successor must bargain before setting terms when it hires all or substantially all of its initial workforce from the ranks of a represented bargaining unit of its predecessor, it being then "perfectly clear" that a carryover majority desires representation. *See Advanced Stretchforming Int'l*, 233 F.3d at 1181.

A successor may not avoid forfeiture of its right to set initial terms of employment by refusing to hire a certain number of its predecessor union employees in order to avoid application of the "perfectly clear" exception. *See id.* (citations omitted); *Kallman v. NLRB*, 640 F.2d 1094, 1102–03 (9th Cir.1981). Here, Onyx hired all of its initial work force from the ranks of the Unit. It later required those employees to reapply for their positions. Such conduct does not avoid forfeiture of Onyx's *Burns'* rights. Onyx was clearly trying to avoid its obligations of successorship by strategically rehiring only a certain number of its predecessor's employees in order to avoid application of the "perfectly clear" rule.

Thus, in sum, the Court finds that Onyx was a successor employer to Heist, but forfeited its right to set the initial terms and conditions of employment under *Burns*.

### 5. Onyx's Violations of the NLRA

Because Onyx was a successor employer to Heist and because it forfeited its right to set the initial terms and conditions of employment under *Burns*, Onyx was required to recognize and bargain with PACE before unilaterally changing any terms and conditions of employment. Onyx violated the NLRA when it refused to recognize PACE and unilaterally changed the Unit's health insurance coverage, 401(k) retirement plan, meal monies, and dues deductions after its March 13, 2000 takeover.

Onyx also violated the NLRA on March 24, 2000, when it unilaterally laid off three of the Unit employees. The layoff resulted in a reduction in Onyx's staff. Layoffs that result in a staff reduction are mandatory subjects of bargaining. *See Holmes & Narver/Morrison–Knudsen*, 309 NLRB 146, 147, 1992 WL 296024 (1992). Because Onyx's layoff of the three Unit employees was a mandatory subject of bargaining, Onyx violated the NLRA by failing to negotiate with PACE about this issue.

Finally, Onyx violated the NLRA when it failed to bargain with PACE about the effects of its decision to relocate the Unit from Niagara Falls to Buffalo on April 30, 2000. Relocation decisions and their related effects are mandatory subjects of bargaining. *Elliott Turbomachinery Co., Inc.*, 320 NLRB 141, 155–57 (1995). Onyx never bargained with PACE about the effects of the relocation, despite PACE's demand that it do so.

### B. Just and Proper

When considering whether injunctive relief is "just and proper" for purposes of § 10(j) of NLRA, the Court must apply traditional equitable principles which require petitioner to show that an injunction is needed to preserve the status quo or to prevent irreparable injury. *See Kaynard v. Mego Corp.*, 633 F.2d 1026, 1033 (2d Cir.1980). "Status quo" is defined as the state of affairs immediately preceding the allegedly illegal conduct. *See Pascarell v. Vibra Screw, Inc.*, 904 F.2d 874, 878 n. 5 (3d Cir.1990). The Court finds that injunctive relief is "just and proper" in this case.

The Supreme Court has recognized that the successorship transition period is an "unsettling" time for employees and unions alike, a time when recognition and bargaining is crucial to the continued effectiveness of the collective bargaining process. *Fall River Dyeing*, 482 U.S. at 39–40, 107 S.Ct. 2225. The unlawful deprivation of recognition of the union can reason-

ably be anticipated to erode employee support for the union to such an extent that by the time the NLRB's order is enforced, the union will be unable to regain its former strength. In *Fall River Dyeing,* the Supreme Court recognized that a successor employer's wrongful refusal to recognize and bargain with an incumbent union "disrupts employees' morale, deters organizational activities, and discourages their membership in unions." *Id.* at 49–50, 107 S.Ct. 2225 (internal quotations and citations omitted).

Such an unsettling situation is present in this case. The Unit employees are now dealing with a new employer who has unilaterally changed the terms and conditions of their employment, laid off three employees, and not only refused to recognize their duly-elected and certified collective bargaining representative, but forced them to accept representation by an entirely different union.

The presence of the Painters is very problematic. The record shows that prior to the sale of Heist to Onyx, PACE provided strong and effective representation of the Unit employees' interests. However, the longer these employees are forced to deal with the Painters, the more their support of PACE will erode.

Moreover, continuing to allow the Painters to represent the Unit employees will erode the Unit employees' confidence in the efficacy of the collective-bargaining system. As a result of the sham contract between the Painters and Onyx, the Unit employees are being forced by their employer to accept representation by a collective bargaining representative that they did not elect. Left unchecked, this will result in the employees becoming disenchanted with any type of union representation and with the collective bargaining system in general.

On the other side of the coin, Onyx will not be prejudiced by the granting of the requested injunction. All that Onyx will be required to do is to bargain with PACE in good faith until there is an agreement or a *bona fide* impasse. This is only what Onyx was required to do in the first place.

At the hearing, counsel for both Onyx and the Painters argued that petitioner may not obtain, as a remedy, withdrawal of Onyx's recognition of the Painters as the collective bargaining representative for the Unit employees, because the petitioner has not made a claim in its NLRB complaint that the Painters Contract is illegal. The Court finds this argument without merit. The NLRB has held that such relief is available under these circumstances. *See N.R. Automotive, Inc.,* 318 NLRB 168, 178–79 (1995).

### CONCLUSION

For the reasons stated, the Court hereby

**1.** **Grants** petitioner's motion for a preliminary injunction; and

**2.** **Orders** that Onyx, its officers, agents, representatives, servants, employees, attorneys, and all persons acting in concert or participation with them are enjoined and restrained, pending the final disposition of the matters involved herein, pending before the NLRB, from:

(a) refusing to recognize and bargain with PACE as the exclusive collective-bargaining representative of the Unit employees, as described below:

All full-time and regular part-time employees engaged in high pressure water cleaning work, wet and dry vacuum cleaning work, and filter press watering system work who work out of the [Onyx's] Buffalo facility, but excluding all office clerical employees, painters, professional employees, guards and supervisors as defined in the [NLRA], and all other employees;.

(b) unilaterally changing terms and conditions of employment, including, *inter alia,* health insurance, travel monies and dues deductions, of employees in the Unit;

(c) unilaterally laying off Unit employees without notice to and bargaining with PACE;

(d) recognizing the Painters as the exclusive collective-bargaining representative of employees in the Unit at Onyx's Buffalo Facility, unless or until the Painters has been certified as the collective-bargaining representative of the Unit;

(e) applying the terms of the Painters Contract entered into on or about March 13, 2000, to the Unit at Onyx's Buffalo facility, *provided however*, that nothing in this Decision and Order shall require Onyx to abandon any wages, hours or other terms and conditions of employment established by the Painters Contract unless specifically requested by PACE; *provided further*, where any such benefit consists of Onyx's payments to any employee benefit funds maintained by the Painters under § 302 of the LMRA, Onyx shall eliminate such payments and must furnish to Unit employees such equivalent benefits;

(f) in any other manner failing and refusing to bargain collectively and in good faith with PACE as the exclusive collective-bargaining representative of its employees in the Unit; and

3. *Orders* Onyx to:

(a) recognize and, upon request, bargain in good faith with PACE as the exclusive collective bargaining representative of the employees employed in the Unit at the Buffalo Facility;

(b) upon request by PACE, revoke any unilateral changes made in terms and conditions of employment, including, *inter alia*, health insurance benefits, travel monies, and dues deductions for the employees employed in the Unit and maintain the restored terms and conditions unless and until Onyx bargains with PACE in good faith to an agreement or an impasse concerning any proposed changes thereto;

(c) offer the three unilaterally laid off Unit employees reinstatement to their

former positions of employment and hours or if those positions no longer exist, to substantially equivalent positions, displacing, if necessary, any workers not previously employed by Heist;

(d) post copies of this Decision and Order at its Buffalo Facility, where Onyx's notices to employees are customarily posted; said posting shall be maintained during the NLRB's administrative proceedings, free from all obstructions and defacements; and agents of the NLRB shall be granted reasonable access to the Buffalo Facility to monitor compliance with the posting requirement;

(e) within 20 days of the issuance of this Decision and Order, file with the Court, with a copy submitted to the Petitioner, a sworn affidavit from a responsible official of Onyx, setting forth with specificity the manner in which Onyx has complied with the terms of the Decision and Order, including how the documents have been posted as required by the Decision and Order.

IT IS SO ORDERED.